OF THE

## STATE OF MISSOURI

AT THE

OCTOBER TERM, 1912.

---

(*Continued from Volume 248*)

---

KANSAS CITY v. ANNA WOERISHOEFFER et al., Appellants.

KANSAS CITY v. METROPOLITAN STREET RAILWAY COMPANY et al., Appellants.

KANSAS CITY v. C. H. CARSON et al., Appellants.

In Banc, March 28, 1913.

1. **SUITS: Consolidation: Street Improvement: Benefit Assessments.** Though the proceeding to assess damages and benefits in a street improvement involved a great many individuals, corporations and tracks of land, yet if there was but one verdict and one judgment in the circuit court, the suits upon the appeals by three separate groups of defendants will be consolidated in the Supreme Court.

2. **PUBLIC WORKS: Attitude of Courts.** Courts do not approach legislative plans for public works with a cold and sour countenance. On the other hand, they recognize that laws are made for the protection of the weak. It is by recognizing both public right and private right, and holding the scales even between the two, that courts, by approximation, reach just and practical results in suits between the public and individuals.

3. ————: **Public Necessity.** It is significant, in passing upon the assessments of damages and benefits arising from grading cross streets to be used as approaches to a viaduct, that the proposed trafficway presents a practical engineering problem, as well as an imperative public necessity. Nevertheless, if a laudable public improvement undertaken by the city does not comport with its charter or the general law, it is the duty of courts to adhere to the law and thwart the plan until it is brought into harmony therewith.

4. **ORDER OF PUBLICATION: Error in Surplusage: Certificate of Date of Order.** Where the essentials of an order of publication are set forth in the publication, mere surplusage does not vitiate it. The date the order of publication was made is not a necessary part of the clerk's certificate of attestation to the copy of the order to be published, and hence the insertion of a wrong date in his certificate does not vitiate the otherwise valid order or its publication, though the entire certificate, including that inaccurate date, is published along with a copy of the order.

5. **PUBLIC IMPROVEMENT: Right to Common Law Jury: Not Demanded by Appellants.** Error to be reversible must be error against appellants. Whether certain railroad companies whose property was affected by the change of the grade of streets were entitled, under Sec. 4, Art. 12, of the Constitution, to a common law jury to assess their damages and benefits, as demanded by them, will not be decided upon the appeal of other defendants who did not demand such a jury, where the railroad companies did not appeal, but abided an adverse ruling upon their demand.

6. ————: ————: ————: **Waiver.** A party may waive a constitutional right. Appellants who did not demand a common law jury in the trial court to assess their damages and benefits in the proceeding to establish a highway and a viaduct therein, will be held to have waived the right to such a jury.

7. **JUDGMENT: Amendment After Appeal.** The circuit court has power to amend its judgment in accordance with the facts and pleadings at any time during the term, even though an appeal has been taken; for though the court had lost jurisdiction of the cause, it still retained enough jurisdiction of its record to make it speak the truth. Amendments of judgments are liberally permitted in furtherance of justice to prevent delay and to correct those oversights incident to every form of human endeavor. The power to amend its judgments is inherent in the court and is an incident of the exercise of all judicial power, both at common law and under the statute, which is but declarative of the common law.

8.  **PUBLIC IMPROVEMENTS: Bonds: Election: No Appropriation for Expenses.**  In the absence of any charter or statutory provision on the subject, an ordinance providing for an election to vote on the issue of bonds to pay for a public improvement will not be held to be invalid for that it failed to carry an appropriation to pay the expenses of the election.

9.  **RAILWAY AND TRAFFIC VIADUCT: Evidence: Agreement Between City and Company: Ordinance: Federal Court Proceedings.**  Where the immediate purpose of the proceeding is to condemn property, overhead easements, widen streets, change grades of streets and assess damages and benefits for those purposes against the lot-owners, as a result of a joint undertaking by a street railway company and a city to construct an elevated viaduct for cars and a roadway for vehicles and footmen, proceedings of the United States court by the receivers of the railway company and a resulting order of authority to them to contract to pay a large sum of money toward the cost of building the viaduct, if the company joined therein, and the resulting contract by virtue of that order between the city on the one side and said receivers on the other, and ordinances authorizing that contract and devoting another large amount of money to the cost of the viaduct, are competent evidence, and are not to be ruled out on the theory that thereby the proceeding is changed from that contemplated by the original ordinances authorizing the improvement, nor as relating to transactions subsequent to the institution of the action, nor as impairing the rights of the parties thereto.  They all go to show that the joint undertaking of the city and railway company was being carried out in good faith and legal form; and instead of injuring the property-owners, they headed toward easing their burdens.

10.  ————: **Ordinance Bonds: Dependable Factor: Presumption of Good Faith.**  Ordinances under which valid bonds are voted, issued and partly sold, and all devoted to the purpose of paying the city's share of the cost of a viaduct for street cars and a roadway for vehicles, jointly undertaken by city and railway company, are potentially equivalent to cash for the purpose of a proceeding to assess benefits and damages; it will be *held*, since two views are open, one noble and the other not, that the company will keep faith with its contract, there being no showing of anything to indicate the contrary.

11.  ————: **Ordinance: Validity: Appropriation of Fund: Based on Estimated Cost: Comptroller's Certificate.**  An ordinance setting out the plans for the construction of a viaduct for the use of street cars and vehicles, condemning certain property and easements and providing for the assessment of damages and benefits, and declaring that certain portions of a public

fund shall be devoted to paying part of the costs, is not invalid because it does not carry an appropriation for building the viaduct and the certificate of the city comptroller that funds therefor are in the city's treasury and otherwise unappropriated. A charter provision requiring those things to appear on an appropriation ordinance does not apply to mere estimated liabilities, such as damages to land taken, which have not actually accrued or become payable.

12. ———: ———: ———: **Complexity: Uniform Whole.** Complexity in an ordinance is not a fatal infirmity, if the different features riding together form one general composite unit. An ordinance changing the grade of an east-and-west and a north-and-south cross street, condemning land and easements, providing for the construction of a viaduct, approaches and retaining walls, and reciting in some instances and encompassing in others ways and means of payment, all being interdependent parts of one general public improvement, does not so unite different proceedings and matters as to render it invalid.

13. ———: ———: ———: **Vagueness: Plans: Not Preserved.** Plans and maps on file with the board of public works, but not brought up in the record for inspection, will not be held sufficient to render the identifying ordinance fatally defective for vagueness. Besides, except in plain cases, it would be indefensible for a court to say that plans, maps or identifying ordinances which have been approved by the city legislature and engineer, are so vague, indefinite and uncertain as to be fatally defective.

14. ———: ———: ———: **Under Wrong Section of Charter of Kansas City: Viaduct: Widening Street: Sections 16 and 17 of Article 6.** An ordinance providing for the construction of a viaduct, the condemnation of an overhead easement or right of way over land, the widening of a street for the construction of the viaduct therein, and the ascertaining of damages and the service of notice, referring to section 16 of article 6 of the charter of Kansas City, and omitting all reference to section 17 of said article, is not for those reasons invalid. Section 16 relates to viaducts, as well as to the regrading of highways, and for condemnation for widening, opening or extending such highways as are regarded by the common council as one "general public improvement." Section 17, on the other hand, relates more specifically to the building of a viaduct and to the condemnation of an easement therefor, which might not be a part of a composite plan constituting one general public improvement. Section 16 does not expressly cover a condemnation of an easement or right of way over land for a viaduct, but the city is not for that reason compelled to look to section 17 for its power for such a condemnation, but may rely

on section 16, for the power of condemnation given by it "for widening, opening or extending" highways or the taking of private property, etc., for the construction of viaducts, is ample to support the ordinance.

15. ———: ———: ———: **Numerous Charter Methods.** Under the Constitution and the Enabling Act, Kansas City has power to provide by its charter for as many methods to meet the varying phases of condemnation for street improvements, and the exercise of the power of eminent domain and taxation by way of special assessments, as it may see fit, so long as they do not contravene the Constitution or general policy of the laws. An ordinance that comports with any one of such valid charter methods will be upheld.

16. ———: ———: **Extending Overhead Easement Beyond Street Line.** The condemnation of an overhead easement above the street in which the viaduct is placed, but widened out over some adjacent abutting property at one point, to prevent great costs and damage, is permissible as an element in the whole general improvement.

17. ———: ———: ———: **Exercise of Full Power: Stopping Short.** The city is not compelled to go to the full extent of its ultimate power in condemnation proceedings; it can stop short of its full power, taking only what is necessary.

18. ———: ———: ———: **Viaduct: Is Change of Grade.** The construction of a viaduct or its approaches within street lines is merely a change in street grade.

19. ———: ———: ———: ———: **Easement.** Neither is there any difference between widening a street and widening an overhead easement in the line of the street so as to allow the viaduct to overhang abutting private property. That is but a widening of the street in a limited sense.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn,* Judge.

AFFIRMED.

*Johnson & Lucas, Ball & Ryland, Rozzelle, Vineyard & Thacher, John H. Lucas* and *William L. Stocking* for appellants.

(1) Ordinance 8316 of Kansas City, which is the foundation of this proceeding, is void, because it at-

tempts to substitute the judgment of the common council for that of the jury as to property values, damages and benefits, and offers to the jury an inducement to return a verdict for less than the value of the property taken and damaged. Such an ordinance deprives appellants of their right to a jury trial, as heretofore enjoyed, and guaranteed by the Constitution. (2) Ordinance 8316 is void for uncertainty and unreasonableness, because it proposes to take and damage the property of defendants, without having made any adequate provision for giving to them the alleged benefits of the improvement, or for paying the damages that may be done to their property. The benefits are purely speculative and uncertain. Kansas City v. Railroad, 230 Mo. 369; Railroad v. Slingerland, 101 Minn. 488; Ice Co. v. Chicago, 147 Ill. 327; Hutt v. Chicago, 132 Ill. 352. (3) Ordinance 8316, upon which this proceeding is based, is void for the reason that it fails to recite section 17 of article 6 of the charter. Said section is the only authority for condemnation of an easement or right of way over any land for the purpose of constructing a viaduct thereon, or for widening a street for the purpose of constructing a viaduct therein. This section provides the exclusive methods of accomplishing these things. (4) Ordinance 8316 is in violation of the charter of Kansas City, in that its provisions join together the condemnation of an easement for a viaduct with the opening, widening and regrading of certain streets. The condemnation of an easement for a viaduct cannot be joined with any other proceeding. Charter, secs. 16 and 17, art. 6. (5) Ordinance 10083 was improperly admitted in evidence, and can have no force or effect in this proceeding. It did not become an ordinance until about four months after the proceeding was instituted, and about three months after defendants were brought into court, and three days after the actual trial of this cause had begun. Shaffner v. St. Louis, 31 Mo. 272. (6) The

testimony shows affirmatively that plans have not been made for the viaduct, and that the whole scheme of the Twelfth Street Trafficway, as hatched and developed, is visionary, impracticable and illegal, and seeks to charge benefits for an improvement that may never take place, and that is merely in contemplation. Kansas City v. Railroad, 230 Mo. 369; Hook v. Railroad, 133 Mo. 322; Isom .v. Railroad, 36 Miss. 312; Waukegan v. Burnett, 234 Ill. 460; Chicago v. Kemp, 240 Ill. 56; Railroad v. Blackshire, 10 Kan. 488.   (7) Ordinance 8316 undertook to yoke up many and different kinds of public improvements and was unauthorized and confusing to the jury.  The charter provides how the cost of the several kinds of public improvements, when the same are to be paid for in special tax bills or by special assessments, shall be apportioned and assessed against private property. The attempt to unite these several separate and distinct public improvements in one proceeding was unauthorized and was so confusing that it was impossible for the jury to determine what would be the benefit and damage to any separate tract or parcel of property.   (8)   Section 8 of the ordinance, after reciting that the common council finds and declares that in the regrading of Twelfth street a large and unusual amount of cutting and filling will be necessary and that this will "impose too heavy a burden on the land situated in the benefit district," states: "The city shall pay $325,000 from the proceeds of the Twelfth Street Trafficway bonds upon the cost of the actual work of regrading Twelfth street and upon the cost of the construction of said viaduct, the remainder of said cost to be charged as a special tax on the land," etc.  But it will be observed: (a)  That what part of this amount shall be paid on account or in part payment of the regrading of Twelfth street and what amount on account of the viaduct construction is not stated.  The effect of this provision in the ordinance,

however, was to prejudice the jury by causing the jury to believe that the private property owners on Twelfth street would receive a great special advantage and be relieved of great burdens from these bonds. (b) The bonds had not been sold, the city counsellor at the time of the trial admitting that only "sixty thousand dollars of bonds have been sold." (c) There was no legal appropriation of money. The remainder of the bonds may in fact never be sold. None of this money may ever be used to "pay the costs of the actual regrading of Twelfth street." Section 14 of the ordinance provides that the cost of certain work "shall be paid by the city out of the general fund or out of the proceeds of the Twelfth Street Trafficway bonds." Here again there is no certificate of the comptroller indorsed on the ordinance as required by law. Kansas City Charter, art. 3, sec. 2; Mister v. Kansas City, 18 Mo. App. 217. The provision above quoted from the new charter is even broader than the corresponding provision of the old charter in this that the old charter read "all ordinances that contemplate the payment of any money," while the new charter inserted before the word "payment" the words "appropriation or." There can be no question that the provisions of this ordinance "contemplate the appropriation or payment of money" and as the ordinance did not contain the certificate of the comptroller as required by the charter the ordinance was passed in violation of the express charter limitation that without such certificate indorsed on the ordinance "it shall not be lawful to pass said ordinances." The ordinance attempts to yoke up in this omnibus proceeding the condemnation of "an easement or right of way for an overhead viaduct only" over private property, something which the charter does not even pretend to authorize to be united in such an omnibus proceeding. Kansas City Charter, art. 6, secs. 16 and 17. (9) This ordinance is an attempt to yoke up several proceedings not au-

thorized by the charter. The objection is, that contrary to the charter and the general law there have been yoked together: first, a proceeding to regrade (a) Twelfth street, (b) Washington street, (c) Pennsylvania avenue, (d) Jefferson street and (e) Summit street; second, a proceeding to condemn a right of way for an overhead viaduct in Twelfth street from Summit street to Liberty street, and third, to condemn a large tract of land lying between Eleventh, Twelfth, Santa Fe and Liberty streets. Such a thing has never heretofore been done in Missouri. (10) The court erred in overruling the objection to the notice to property-owners and affidavit of publication. Proceedings of this kind are *in invitum* and must be pursued strictly. Tarkio v. Clark, 186 Mo. 285; Grading Bledsoe Hill, 200 Mo. 630.

*Andrew F. Evans* and *Hunt C. Moore* for respondent; *John G. Schaich* and *Park & Brown* of counsel.

(1) The court properly overruled the objection to the notice to property-owners and order of publication. (a) These provisions of the charter do not require a certified copy of the order to be published, only a copy which is correct in point of fact. The certificate was surplusage. Where such publication is had as is required by law, that is all that is necessary. State ex rel. v. Gordon, 217 Mo. 103. That which the law does not require to be published, need not be published. State v. Hutton, 39 Mo. App. 410; State v. Foreman, 121 Mo. App. 502; Webb v. Strobach, 143 Mo. App. 469; Gabbert v. Railroad, 171 Mo. 95. Surplusage in an order of publication will not vitiate it, if it be otherwise sufficient. Cruzen v. Stephens, 123 Mo. 344; Burnes v. Burnes, 61 Mo. App. 612; Winningham v. Trueblood, 149 Mo. 572. (b) The order of publication (notice to property-owners) shows on its face that it was made on May 17, 1911. The

order of court, entered of record, certainly prevails over the voluntary non-official certificate by the clerk. Fleming v. Tatum, 232 Mo. 690. (2) There was no demand made for a common law jury by a corporation having property taken. State Constitution, art. 12, sec. 4. In the cases of Kansas City v. Vineyard, 128 Mo. 75, and Kansas City v. Smart, 128 Mo. 272, this court held that a city is not an "incorporated company" within the meaning of this provision. The assessment of benefits under the provisions of the charter or Constitution of Missouri is not an exercise of the right of eminent domain, but an exercise of the taxing power of the city. Meier v. St. Louis, 180 Mo. 408; Corrigan v. Kansas City, 211 Mo. 608; Construction Co. v. Shovel Co., 211 Mo. 524; Construction Co. v. Railroad, 206 Mo. 172; Garrett v. St. Louis, 25 Mo. 505. The change of grade of Twelfth street was not an exercise of the right of eminent domain. Without such provision as that in article 2, section 21, Constitution of 1875, there can be no recovery for damages to abutting property resulting from the mere change of grade, there being no physical injury to the property itself and the change being authorized by law. St. Louis v. Gurno, 12 Mo. 414; Taylor v. St. Louis, 14 Mo. 20; Hoffman v. St. Louis, 15 Mo. 651; Schattner v. Kansas City, 53 Mo. 162. "To grade a street or alley already dedicated to public use is not an exercise of eminent domain so as to require compensation, if it is done skilfully and discreetly." Taylor v. St. Louis, 14 Mo. 20; Householder v. Kansas City, 83 Mo. 488; Sheehy v. Railroad, 94 Mo. 574; St. Louis v. Roe, 184 Mo. 324; Railway v. Knapp, 160 Mo. 396. (3) Ordinance 8316 was and is valid. (a) No appropriation of funds or certificate by the comptroller was necessary. Ordinance 8316 is the ordinance whereby the city has expressed its determination to exercise its power to regrade streets, its power of eminent domain in taking property for public use

and its power of taxation in levying special assessments. In the cases of Kansas City v. Railroad, 230 Mo. 369, and 230 Mo. 379, this court held at page 378: "That there is no legal showing that such viaduct will be constructed in the near future or reasonable time, therefore there is no foundation in law for the proceeding relating to the grading of Twelfth street or that relating to the condemnation of the three blocks mentioned." This made it necessary to formulate a complete plan, not only for construction, but also for financing. Ordinance 8316 was prepared and enacted to meet the requirements of the decision, supra. It is not an ordinance providing for any contracts. In it the city does not act as a business corporation or in its proprietary capacity, but in its governmental capacity in opening and regrading the highways and levying the assessments. Of course, it would be impossible for the city to determine in advance of the report of the commissioners what those commissioners would or should assess against the city for its share of the benefits. Ordinance 8316 follows the charter. The various sections, complete within themselves, do not require any appropriation of money, and consequently require no comptroller's certificate. 2 Dillon's Mun. Corp. (5 Ed.), p. 1178, note. (b) The joinder of the various features of this ordinance in one proceeding is expressly authorized by the charter. Kansas City has plenary power in the regulation of the practice in condemnation proceedings. Kansas City v. Oil Co., 140 Mo. 471; Brunn v. Kansas City, 216 Mo. 117; Kansas City v. Bacon, 147 Mo. 259. It is entirely legal to join these features in one general public improvement. In re Third, Fourth and Fifth Avenues, 49 Wash. 109, 94 Pac. 1075, 95 Pac. 862; Sears v. Commissioners, 180 Mass. 274, 62 L. R. A. 144. Section 1a of ordinance 8316 provides merely for the widening of Twelfth street and is authorized by art. 6, sec. 16, of the charter. This section provides

for the widening of Twelfth street by the condemnation of this easement, and it is a widening. The city clearly had the power to condemn the surface rights over this tract of ground. If it had done so there could have been no question raised as to the validity of its act. The property is very valuable and the city did not need and could not use the surface rights. It did need and sought to acquire the right to push the viaduct northward over the present improvements. It is not necessary that the condemning power should exercise its ultimate right. It may condemn a smaller right and a lesser easement than an exclusive right. Railroad v. Clark, 121 Mo. 169; Tyler v. Hudson, 147 Mass. 609; Railway & Navigation Co. v. Owsley, 3 Wash. Ter. 38; Willis v. Winona, 59 Minn. 33; Sauer v. New York, 206 U. S. 544. The building of the viaduct in Twelfth street is merely a change of grade authorized by art. 6, sec. 16, of the charter. ''The construction of an elevated bridge approach, or of an elevated viaduct, within the lines of a street, when devoted to the ordinary purposes of street travel, is regarded as a mere change of the grade of the street.'' 3 Dillon on Mun. Corp. (5 Ed.), sec. 1159; DeLucea v. North Little Rock, 142 Fed. 597; Selden v. Jacksonville, 28 Fla. 558; Willis v. Winona, 59 Minn. 33; Mfg. Co. v. Mercer Co., 62 N. J. L. 95; Talbot v. Railroad, 151 N. Y. 155, 78 Hun 473; Sauer v. New York, 180 N. Y. 27, 206 U. S. 536; Sadlier v. New York, 185 N. Y. 408, 104 N. Y. App. Div. 82; Brand v. Multnomah Co., 38 Ore. 94; Mead v. Portland, 45 Ore. 1, 200 U. S. 148; Home Bldg. Co. v. Roanoke, 91 Va. 52; Colclough v. Milwaukee, 92 Wis. 186; Walish v. Milwaukee, 95 Wis. 16.  (c)  There was no joinder of proceedings under sections 16 and 17 of article 6. Ordinance 8316 is based upon and, in every feature, supported by, section 16. That being true, what might have been done under section 17 is wholly immaterial. Sections 16 and 17 seem to cover some common ground, but a

minute comparison of their respective provisions is
unnecessary. (d) It would be impossible for the or-
dinance to specify how much of the damages shall be
paid out of the general fund of the city, and the char-
ter does not require it. Article 6, section 16, of the
charter, which is the foundation of this proceeding,
provides that: "Such ordinance or ordinances shall
in such case provide also for the payment of compen-
sation for private property so taken or damaged
either out of the general fund of the city or by special
assessments upon a benefit district, or by both," etc.
As to damages, section 7 of article 7 is: "To pay the
total amount of such damages allowed, they [the com-
missioners] shall first assess against the city such
sum as is equal to the amount of benefits the city at
large will receive from the proposed improvement,
and the balance of the sum so awarded . . . against
the private property within the benefit limits," etc.
Guessing on verdicts has never been a particularly
profitable employment, and it is unnecessary to do it
by ordinance. The whole matter is committed to the
discretion of the condemnation jurors, and they, and
they alone, have power to determine how much of the
damages the city shall pay. (e) The charter nowhere
requires that in advance of the condemnation of land,
the grading of streets and the acquisition of rights
of way there shall be an appropriation of money for
the building of a bridge or viaduct. The tying up of
large sums of money in that way would be sheer non-
sense. (4) The contract with the street railway re-
ceivers did not change the essentials of ordinance
8316. It did not change the purpose of the city or
the issues involved, and did not invalidate this pro-
ceeding. An amendment is always permissible which
lightens the load of the defendant. Goddard v. Wil-
liamson, 72 Mo. 131. The change in this case was
greatly beneficial to the property-owners in that it
relieved them to the extent of $275,000 of the burden

of prospective tax bills.    In re Third, Fourth and Fifth Avenues, 49 Wash. 109, 94 Pac. 1075, 95 Pac. 862.    (5)    The entry of the amended (or *nunc pro tunc*) judgment was proper.    The court had the power to make the judgment conform to the ordinance and charter of Kansas City because the ordinance, for the purpose of this case, is the petition.    Tarkio v. Clark, 186 Mo. 297.    And the court should make the judgment express the determination of the issues as made by the pleadings.    Eddie v. Eddie, 138 Mo. 599; Saxton v. Smith, 50 Mo. 490; Horskotte v. Menier, 50 Mo. 158; Allen v. Sales, 56 Mo. 28; Lexington v. Mockbee, 63 Mo. 348; Loring v. Groom, 110 Mo. 632; State ex rel. v. White, 75 Mo. App. 275; Elliott v. Buffington, 149 Mo. 676.

LAMM, C. J.—These are appeals by lot-owners from the assessment of damages and benefits in a street improvement, known as the Twelfth Street Trafficway.    Three appeals came up and bore our serial docket numbers 16927, 17036, 17042.    In the first Anna Woerishoeffer and another, in the second the Metropolitan Street Railway Company and three others, in the third C. H. Carson and Elizabeth Strope, are appellants.    The proceeding involved a great many individuals, corporations and tracts of land in Kansas City, but there was one verdict and one judgment in the Jackson Circuit Court.    So, the suit, though of omnibus character, was an entirety.    In view of those facts, under the reasoning of State ex rel. v. Gill, 84 Mo. 248, those appeals were consolidated here into one cause on motion.    The public interest being involved, the consolidated cause was advanced on motion, heard In Banc at the January call, 1913, and submitted on oral argument and a group of briefs.

Pending these appeals, two appellants, Elizabeth Strope and C. H. Carson, died testate.    Thereat George W. Strope (executor and sole devisee under

the will of Elizabeth) and Frank F. Rozzelle (executor of the last will of C. H. Carson) and divers persons, heirs and devisees of Carson, enter their appearance as substituted parties and on leave granted file briefs.

The case, in outline, is this:

Topographically the lay of the land on which Kansas City is situate is unique, viz., bottoms and upland (hereinafter called uptown)—the line of demarkation between uptown and bottoms being a bold bluff. Speaking generally, in the bottoms are packing, wholesale and manufacturing interests, together with freight depots, stockyards and allied businesses, while uptown are the retail and residence districts of a great and rapidly expanding city. Twelfth is an east-and-west street of some length and cuts the bluff at right angles. Twelfth at the bluff, left in a state of nature, is too precipitous for surface hauling or travel. Appellant railway company has long had one track, and maybe more, on Twelfth passing over the bluff on a viaduct. But this viaduct was not for ordinary street travel or traffic. It was confined to street cars. Twelfth street is the shortest distance between the heart of the business district in the bottoms and the residence and retail districts uptown. If opened it would be the town's main artery. Barring street-car passage, up to this time the immense surface hauling and travel, to and fro from the bottoms and uptown, is by circuitous routes to the north and south of Twelfth over heavy grades on Sixth and Twenty-fourth streets. In busy hours the stream of hauling and travel flows over a network of railroad tracks and was often dammed, to the delay and detriment of transportation, time being money in commerce and travel. The growth of the city's population and traffic has been such that its commerce was more and more clogged and handicapped by those conditions and its future development menaced. Moreover, the rail-

way company faced this situation: Its viaduct was old and needed reconstructing. Thereon it has used cable cars up to this time—a form of transportation (in this case) dangerous, antiquated and inadequate. The mutual welfare of company and city exciting and enlisting mutual interest, the establishing of a grade and building a viaduct on Twelfth suitable to the needs of both, so that the street-car line might be modernized and electrified and travel and traffic on Twelfth be opened over the bluff, had become a matter of crying public concern.

There is a street crossing Twelfth in the bottoms known as Liberty. There is another uptown crossing Twelfth known as Broadway. The Trafficway, as the proposed plan will be called, starts at Liberty as its west terminus and ends at Broadway as its eastern. The distance between the two is more than a half mile. The proposed viaduct structure is the rise of two-fifth of a mile long. To solve the engineering problem of the Trafficway, the grade not only of Twelfth, but portions of some cross streets between the bluff and Broadway (viz., Washington, Pennsylvania, Jefferson and Summit) had to be changed. It was also necessary to widen Twelfth on the surface for a certain distance in the bottoms and to condemn land for that purpose, also to condemn an overhead easement on Twelfth for the viaduct. So, to save a great and unnecessary expense in the bottoms, at a certain point on Twelfth for a very little way on one side, it was necessary to widen the overhead right of way on Twelfth by condemning an overhead right of way over a little strip of land fifteen feet wide on which buildings stand. Approaches thereto and a double-deck viaduct built of reinforced concrete were component parts of the improvement, as said. The upper deck of this viaduct is for street cars, then a roadway for wheeled vehicles and horse travel, next a footway, all sixty feet wide from out-to-out. The lower deck,

on an easier grade, was necessary for the heaviest hauling and is thirty feet wide.   Travel on this lower deck does not leave or enter the viaduct at the same level as on the upper deck.   This necessitated a street approach or roadway known as Beardsley street to be constructed, and the heavy hauling flows in and out of the lower deck from the north and south on Beardsley.   Heavy fills were necessary at the east end of the viaduct to be buttressed by retaining walls.

Such was the scheme *as a whole,* demanding this proceeding as a necessary step.

The first attempt to widen Twelfth, condemn an overhead easement, to build this viaduct and its approaches, to assess damages and benefits, and do the necessary grading on Twelfth and cross streets, was abortive.   [Kansas City v. Railroad, 230 Mo. 369.] That proceeding, commenced under a former ordinance and charter, was an attempt to assess damages and benefits.   Unfortunately it was apparent, under the record presented, that the benefits would be purely conjectural and speculative unless the viaduct was built.   There was where the shoe pinched.   There was no evidence (outside of oral testimony) that there was an existing concrete *municipal* plan, intent or ability to build the viaduct, or any official action heading thereto.   However, the city was successful below in the first proceeding and, as said, the cause was appealed here.   On the showing then made we reversed the judgment with directions to dismiss the suit.   [230 Mo. 369, supra.]   The opinion in that case should be read with this, because in this case there is an elaborate and conscientious effort on the part of the city to meet the requirements outlined by this court in the former case, to which we will recur again.

The engineer's estimate of the cost of the viaduct proper, as planned, is $565,000.   Absent countervailing evidence, that estimate may be assumed

throughout as true. At a bond election bonds to the
amount of $475,000 were voted by the city for the
purpose of aiding in the building of the viaduct and
the grading of Twelfth street, the cost of the latter
being, say, $15,000. By ordinance $325,000 of the pro-
ceeds of those bonds were pledged and devoted to the
improvement. By another and later ordinance $75,000
more of the proceeds of the bonds were pledged and
devoted to the same purpose. The Metropolitan Street
Railway Company is in the hands of two receivers
appointed by the decree of the United States court.
Having an eye to said Trafficway, on the petition of
those receivers, setting forth the facts, that court en-
tered an order, among other things, authorizing them
in connection with the company itself to contract with
the city to pay $200,000 towards the cost of the via-
duct and the regrading of Twelfth, out of the earn-
ings of the company—$40,000 to be paid on a given
date and $20,000 on or before the first day of each
month thereafter and to execute interest bearing
obligations therefor *"as an improvement of their
Twelfth street line."* The receivers presently joined
with the company in executing that contract, a con-
tract entered into on the authority of an ordinance,
and by ordinance that contract sum, as well as said
bond proceeds, is devoted to the construction of the
viaduct.

In addition to the foregoing, power is given by the
charter and by ordinance passed to create a fund by
the assessment of benefits in aid of the same purpose.

The labors of the jury in this cause covered forty-
eight days. Its verdict on benefits, an immense book
of ten thousand separate findings, is not brought here
by appellants. A summary of the verdict on damages
is given by the abstract as follows:

| | |
|---|---:|
| Damages allowed on account regrading Washington street .............................$ | 3,869.00 |
| Damages allowed on account regrading Pennsylvania avenue .............................. | 5,127.50 |
| Damages allowed on account regrading Jefferson street ............................... | 1,700.00 |
| Damages allowed on account regrading Summit street ................................... | 640.00 |
| Damages allowed on account regrading Twelfth street .................................. | 41,625.70 |
| Damages allowed on account condemnation...... | 257,182.05 |
| Total damages allowed..................$ | 310,144.25 |

At the time of the trial, $60,000 of the voted Trafficway bonds had been sold. At the hearing here it was suggested, and not denied, that the balance had been sold. Kansas City was adjudged to pay all costs. After the verdict and judgment, the city paid into court the sum of $52,962.20 in full payment of the aggregate item of damages allowed for the grading of all the streets included in the comprehensive Trafficway scheme. In that gross amount are the several sums awarded appellants and numerous other parties owning property damaged.

Exceptions were taken to instructions given by the court at the hearing of the trial; but those exceptions are not pursued on appeal, hence need no notice.

Of the multitude of persons affected by the assessment of damages and benefits a few only filed motions for a new trial. Of those few only eight, as said, prosecute appeals. Those appeals relate to the assessment of benefits and damages to certain tracts of land east of the bluff, arising from the grading necessary on Twelfth and on cross streets to make them agree in grade with Twelfth as regraded.

There are so many briefs assigning so many errors overlapping each other that it will be inconvenient to strictly follow the arrangement of briefs of counsel. We will formulate vital questions in our own

way, and other necessary facts will appear in connection with questions ruled.

I.  A foreword is not amiss, thus:

(a)  It is argued this is an attempt "to rob" appellants under the forms of law—a grievous charge. So, in motions filed there is a suggestion (somewhat faintly echoed later in briefs) of hostility *Attitude of Courts.* to a certain patriotic glow or fervor of respondent's counsel in presenting their side of the case.  In that line we are warned at one place that "the last refuge of oppression is patriotism"— this as a deterrent, we suppose, against this court's being carried away by the sweeping influence of *patriotism.*  As to that we submit these observations:

It was Doctor Johnson (was it not?) who said "the last refuge of a scoundrel was patriotism."  But that viewpoint is of no (or little) use in administering law through judicial tribunals, a part and parcel of a patriotic government.

(Note, by way of a sidestep:  "The Great Cham of Literature," said Doctor, as well known, had violent and fanciful prejudices much in amusing evidence even in his dictionary—a kind of book in which the topic is so infinite and changes so rapid and frequent that scholarly calmness is a *sine qua non.*  Witness his definitions of "pension," "patriot," "oats," "patron," "Whig," "Tory," "lexicographer," "Methodist," "Presbyterian," "poetess," "Puritan"—*q. v.*)

It is not the duty of courts to approach legislative plans for public works, promoting public welfare, with a cold and hostile countenance as if determined to drive a coach-and-six through them or make them perish by overnice analysis in criticism.  On one side, to be reckoned with, stands the axiom of Jeremy Bentham, to-wit:  "The greatest happiness of the greatest number is the foundation of morals and legislation."  On the other stands the legal maxim in a dead

language, to-wit: *Inde datae leges ne fortior omnia posset,* which (a scholar assures me) means: Laws are made lest the stronger party should possess all— i. e., for the protection of the weak, the individual. Peradventure it is by recognizing both great and small, public right and private right, and holding the scales even between the two that courts by approximation get at just and practical results in suits between the public and individuals. In performing that high and delicate function, courts should sound at every step to see if the ground is solid and they are not usurping the province of the lawmaker in making a judicial out of a legislative question.

(b) It is, we think, of significance both deep and wide that the cause is presented to us on a record putting it beyond all question that the proposed Trafficway presents a safe and practicable engineering problem as well as an imperative public neces-

Public Necessity. sity. Not only is there no countervailing testimony on that behalf, but appellant railway company is in an attitude bespeaking attention, viz.: It has contracted to pay $200,000 (of which, more hereafter) toward the building of the viaduct and regrading of Twelfth, as determined on, which we take as an admission on its part to the foregoing effect. We shall assume that view of it in proceeding to judgment.

II. *Of the order of publication.*

The charter of Kansas City provides that the court in which a proceeding of this sort is brought shall make an order of publication giving notice to parties interested. That notice must be published for a certain time and its publication proved. In this case such order was duly made on May 17, 1911, and the date was correctly set forth in the record of the certified copy published. Proof of publication was duly made. The publisher, however, printed with the order

a certificate of the clerk of the court. In that certificate the clerk erroneously certified the order was made on the "21st day of March, 1911." That certificate was carried for awhile in the publication and then corrected to state the true date. Objection was made below that such clerical blunder was fatal. The trial judge refused to take that view of it and his ruling is assigned as error.

The charter did not require a certificate of the clerk setting forth the date of the order, or any certificate at all. But the usual course is for the clerk to attest such orders as true copies. When he attested the copy of the order as a true one and gave the date of his attestation under his official seal, as this clerk did, that was sufficient. The surplus matter in his certificate, to wit, the inaccuracy in the date of the order, did not affect the validity either of the order or of the publication; because self-evidently it could mislead no one, where, as here, the return day was correctly given and the order itself is not assailed as insufficient in any particular, even in date.

In dealing with orders of publication, where the essentials are set forth, mere surplusage does not vitiate. Much more is that true in this case where the surplusage is not in the order itself but is in the clerk's certificate and his mere penslip is counted on as matter *dehors* the record to override or impugn the solemn declaration of the true record as published. Agreeable thereto is the doctrine of Gabbert v. Railroad, 171 Mo. l. c. 95; Cruzen v. Stephens, 123 Mo. l. c. 344; and Fleming v. Tatum, 232 Mo. l. c. 689, et seq.

There is no substance in the point and it is disallowed to appellants.

III. *Of a common law jury.*

Two railway companies owning land abutting on Twelfth, past which an easement for the viaduct was

condemned, demanded a common law jury. The jury (or commissioners) selected was a charter one of six. The court overruling the application, an exception saved is pressed as error. No one of the present appellants demanded a common law jury and those corporate defendants demanding one did not appeal.

Section 4, article 12, of the Constitution reads:

"The exercise of the power and right of eminent domain shall never be so construed or abridged as to prevent the taking, by the General Assembly, of the property and franchises of incorporated companies already organized, or that may be hereafter organized, and subjecting them to the public use, the same as that of individuals. The right of trial by jury shall be held inviolate in all trials of claims for compensation, when in the exercise of said right of eminent domain, any incorporated company shall be interested either for or against the exercise of said right."

The demand for such jury was based on the foregoing constitutional provision. It will be observed that it is limited to cases involving the exercise of the right of eminent domain in "taking" property. On that cue it is argued by respondent that the proceeding (with reference to those defendants demanding a common law jury) was not the exercise of the right of eminent domain, but the exercise of the taxing power of the city. This argument runs on the theory that as to those defendants the proceeding to condemn an overhead easement was to all intents and purposes a mere change of street grade and not an exercise of the right of eminent domain in taking property.

We think it unprofitable to let the point break on a subtle distinction between the exercise of the right of eminent domain in taking property and the exercise of taxing power in changes of grade (assuming for the purposes of the point that the condemnation of an overhead easement is tantamount to a change of grade). In this case it is sufficient to hold

that appellants, who demanded no such jury, cannot take up and use, for their own appellate purposes, the cudgels thrown away below by those who did make such demand, but who abided the judgment and verdict below. Error to be reversible must be "error . . . against the *appellant or plaintiff in error.*" [R. S. 1909, sec. 2082.] None of these appellants fill that bill. In reason their right to make the point now on appeal could only be a right derived from those who made the point below and had the primitive right. Since the primitive right is lost to them by their failure to appeal, the derivative right is lost to appellants. *Cessante statu primitivo, cessat derivativus.*

Moreover, since none of these appellants demanded such jury they waived the right to one if they had that right. It is a clear principle of law that a party may waive even a constitutional right. [Merrill **v.** St. Louis, 83 Mo. l. c. 252, and cases cited.] The doctrine of the Merrill case has been consistently followed in later decisions. In Kansas City v. Smart, 128 Mo. 293, is the following decisive and apposite pronouncement In Banc:

"It seems to us that, construing all the provisions of the Constitution together, it is very plain that the Constitution guarantees 'the historical jury' of twelve only for or against incorporated companies in proceedings to exercise eminent domain, and this was to guard against prejudice in favor of or against private corporations exercising that right or affected by it, and this constituted an exception. As to all other persons the board of commissioners, not less than three, was deemed sufficient. If the incorporated companies waive that right, no other party has any just cause of complaint. The exception was not created for his benefit. The failure or refusal, then, to award the Realty Investment Company, or any other interested incorporated company, a jury of twelve cannot avail either of the appellants here."

The premises considered, the point is ruled against appellants.

IV.  *Of motions to dismiss.*

Twice at the trial appellant railway company interposed motions to dismiss.  These motions were overruled and an exception was saved and brought up. They ran on the theory that the whole plan and proceeding was void for vagueness and uncertainty, wherefore the court was without jurisdiction to assess benefits or damages or render a judgment therefor.

A study of these motions makes it quite plain that if the ordinance plan and proceeding was vague, indefinite and uncertain, the motions to dismiss were tarred with a like stick; for, while the blanket charge is made by movent, it does not in the motions put its corporate finger on any specification whatever.  But aside from that view, the same or equivalent objections, in specific form, are urged elsewhere in appellants' briefs and, when disposed of in due course, as they will be, such rulings dispose of the motions.  As the same matter need not be considered in one form and then in another, the motions are passed by as *functus officio.*

V.  *Of an amendment of the judgment.*

Presently after its rendition, on motion by plaintiff on due notice (and at the same term of court), an amendment to the judgment was made to supply certain omissions and to conform to the pleadings— in this case, the ordinance which (in lieu of a petition) was filed in accordance with the charter scheme for initiating this character of proceeding in the circuit court.  Unsuccessful objections were made to that amendment and the ruling thereon is assigned for error.

It is not claimed the amendment was not warranted by the facts, or by the pleadings, but it is

claimed the court was without power to make it because (counsel say) the original was void as not in conformity with the ordinance, hence there was nothing to amend by. Learned counsel content themselves with making the point without reasoning it or pointing to any principle of law or decision sustaining them. We know of none.

A judgment is a judicial act, it is the sentence of the law upon the record. [Donnell v. Wright, 199 Mo. l. c. 318.] It is the "final determination of the right of the parties in the action." [R. S. 1909, sec. 2090.] Judicial acts during the whole term are so far forth *in fieri,* in the breast of the court, or bosom of the law (*in gremio legis*) as to be subject to amendment. [Crawford v. Railroad, 171 Mo. l. c. 74-5.] Hence the right doctrine is that amendments of judgments are liberally permitted in furtherance of justice to prevent delay and correct those oversights incident to every form of human endeavor. [R. S. 1909, sec. 1851.] We are forbidden to reverse a judgment because of an amendment filling such office. At common law the power to make amendments was inherent in a court and an incident of the exercise of all judicial power. [Wright v. Groom, 246 Mo. 158.] And the statute referred to is but declarative of the common law.

It was the clear duty of the court to make its judgment complete evidence of the determination of all vital issues made by pleadings and tell the truth. [Eddie v. Eddie, 138 Mo. l. c. 604-5.] The right to amend was not altered by the appeal; for the trial court, though it had lost jurisdiction of the *cause,* still retained enough jurisdiction of its *record* to make it tell the truth. [Reed v. Colp, 213 Mo. l. c. 586, et seq.]

VI. *Of error in the admission of evidence.*

Most of the propositions remaining to be discussed are put in one or another of appellants' group of

briefs under the head of error in rulings in admitting evidence. But most of them can and will be approached from a different angle, viz., that of the probative force of the evidence admitted. However, it is more convenient to consider two or three as rulings on evidence. This we proceed to do.

(a) Respondent was allowed to introduce, over appellants' objection, four ordinances, numbered 5329, 5330, 5926 and 6289 respectively. Number 5329 contained proposals to the qualified voters to borrow money and issue bonds, increasing the indebtedness of Kansas City, and providing for the publication of said proposals and holding an election at which the same should be submitted, and repealing certain other ordinances—this in view of charter requirements, not questioned and hence pretermitted. The fourteenth proposal related to increasing the city's indebtedness $475,000 in the matter of the Twelfth Street Trafficway. Number 5330 was for a like purpose and called

Ordinance: Expenses of Election.

an election for the 19th day of July, 1910. Number 5926 declared the favorable result of the bond election, authorized the issue of the bonds and provided for an annual tax for interest and sinking fund. Number 6289 made sale of some of the bonds. The detail provisions of these ordinances are unnecessary here, because the only objection made to their introduction is that the first and second of the series carried no appropriation to pay the expenses of the election, hence were nullities. Observe, we are asked to hold the election and bonds void for failure of the election ordinances to appropriate out of the city chest the election expenses. It is not even claimed that there was no such appropriation made otherwise, or that the expenses were not in fact paid.

We have looked with some interest for a charter or statute provision directly or impliedly striking down an election and invalidating a series of bonds

on such ground. Our search has been vain. Counsel point us to no such provision or any legal principle squinting that way; and we know of none invalidating an election, otherwise regular, because the officers holding it or the newspaper publishing the proposals and notice, served without pay, *pro bono publico*; or, expecting it, received no pay—*a fortiori* should a mere failure to show an appropriation therefor be without virtue in invalidating an election. As suggested by counsel for respondent, if appellants' view be sound, a city with an empty treasury could not hold a valid election at all. Must an officer about to receive his commission or a broker about to buy a municipal bond look to see whether the election officers were paid or whether means were appropriated therefor? We fear the point is a virgin one and if allowed would spread confusion in unexpected ways.

We hope it is treating the assignment with becoming judicial gravity and decorum to apply to it a phrase, used by no less an authority than Sir John Fortescue in a learned work four hundred years old in commendation of the laws of England, viz., Moche Crye and no Wull—put by the German peasant into the fireside colloquialism: *Viel Geschrei und wenig Wolle.*

It is disallowed for lack of substance.

(b) The admission of the proceedings in the United States court by the receivers of the Metropolitan Railway Company, and the resulting order of authority to contract to pay $200,000 toward the cost of building the viaduct, if the company joined therein, and the resulting contract by virtue of that order between the city on one side and said receivers and company on the other, and the ordinances (numbers 9820 and 10083) authorizing that contract and devoting that $200,000 to the cost of the viaduct

*Viaduct: Receiver of Railway: Contract With City.*

(all hereinbefore referred to) was unsuccessfully objected to and that ruling is now assigned as error.

The gist of the objection is that thereby the proceeding is changed from that contemplated in the original ordinance, that the evidence relates to transactions subsequent to the institution of the action and cannot impair or affect the rights of the parties thereto.

To rule properly on that assignment, the following propositions must be steadily kept in mind:

(1) In the first place the immediate life and purpose of this particular proceeding is not to provide funds for the construction of the viaduct. It is to condemn property, easements, widen streets, change grades and assess damages and benefits for those items, all.of which are essential precedent steps to the construction of the viaduct and head up to it as the consummation of the Trafficway in its entirety.

(2) In the second place we held in the former case, in effect, that the city could not take such precedent steps until there was official action, a legislative step, evidencing a municipal plan, intent and ability *in praesenti* to build the viaduct. Otherwise (*benefits* lying at the root of the power invoked against the property-owner) the benefits assessed would be conjectural and speculative—i. e., the property-owner damaged could well say: You offset my actual damages with the moonshine of imaginary benefits from an imaginary viaduct. You take a ducat from my pocket and pay me back in chips and whetstones, thereby despoiling me in the name of the law, doing like the unjust man I remember to have read of, viz.:

> "With one hand he put
> A penny in the urn of poverty,
> And with the other took a shilling out."

It was argued by the city in the former case that that proceeding was a step in a comprehensive munici-

pal plan, a unit, having the viaduct as a component part of its consummation; but we held, in effect, that the composite unit, viz., the plan as a whole, rested on the unsubstantial foundation of mere oral testimony in the form of hope, anticipation, contemplation, *et cetera*—mere untempered mortar. That the joints of the segments of the plan could not be welded in the way proposed so as to make a unit, hence the proceeding must fail. It was much the same as if the court had asked: "Is a viaduct to fill a gap in Twelfth street an essential to the rounded plan?" The answer being, "yes," the court next asked: "Will it be built?" The answer was: "The witnesses by word of mouth say so." But, answered the court, they speak without authority, they bind the city neither by "cable tow or silken thread." So that the viaduct was left in the former case outside the realm of any official action—an *air line* indeed, *in nubibus*. We were asked in that case to approve the assessment of benefits and damages for grading, etc., leading up to a viaduct the city was not pledged to build or was not shown to be able to build. This we declined to do. The judgment in that case is well buttressed by authority (Hutt v. Chicago, 132 Ill. 352; City of Waukegan v. Burnett, 234 Ill. 460; Isom v. Railroad, 36 Miss. l. c. 312), and we stand by its doctrine as declared.

(3) In the next place, confronting the situation set forth, the city in this case carried the burden of showing the viaduct was not only in mere contemplation, but that it had taken such official action and made such provision as showed it would be built when it could be, that is, when that stage of the Trafficway was reached. It must be remembered that the city in its corporate capacity is now solemnly pledged to the whole plan. The building of the viaduct has now been ordered by ordinance, $400,000 of valid bonds have been voted, pledged (and sold) for that purpose, the city has al-

Dependable Factors.

ready paid the damages for grading Twelfth street and the cross streets. It has already assessed benefits and damages on all property taken. It has reserve power (which it has declared its intention to use) to raise money to aid the construction of the viaduct itself, in case of necessity, by special benefits to be distributed over a benefit district and to contribute from its general fund, and, to crown all, it has a contract, which so far as we can see is valid and on sufficient consideration, for $200,000 from appellant railway company, whose great revenues are bound to respondent in that sum by a decree of court and its own solemn corporate action.

In view of the premises, the evidence was admissible to show the good faith of the city, its intent and ability as shown by official action to build the viaduct as soon as practicable and thereby differentiate this from the former case.

Its introduction in no wise changed the original proceeding in any essential that we can see. There was no prejudicial variance. [In re Third, Fourth and Fifth Avenues, Seattle, 49 Wash. 109.] The proceeding was carried through as begun. The case of Shaffner v. St. Louis, 31 Mo. 264, relied on by appellants, differs in principle from that at bar.

Moreover, instead of injuring them, the evidence headed towards easing the burdens on appellants as lot-owners. Take a case: Suppose (as put by counsel for respondent) a public benefactor had by way of gift deposited the whole cost of the viaduct proper, exclusive of grading damages, in open court, would that gift have been error of which appellants could complain?

It was suggested in *oral* argument (but not in briefs) that the contract between the city and railway company is not a dependant factor. Why? Because,

it was said, it is a promise hanging on a
**Good Faith Assumed.** slender thread that may be broken—a bird in bush and not in hand. But we shall not pass on the admissibility of testimony from the cynical standpoint that a powerful public service corporation, holding a monopoly of street railway passenger service in Kansas City, is dealing in Punic faith or toying with the public. The rule is that where two views are open, one noble and the other not, courts are warranted in taking the nobler view. Fraud, wrong or dole is never presumed. That such will happen is a vain fear. *Vani timoris justa excusatio non est.*

We have said $400,000 of the bonds devoted by ordinance to building the viaduct have been *sold.* The sale ordinance read into the record disposed of $60,000 of them. As said, it was suggested at our bar and not denied they had all been sold. The evidence of that fact was said to be found in an affidavit of the mayor attached to a motion in the case. We need not pursue the inquiry. Technically the *ex parte* affidavit of the mayor is not part of the record and should not control our judgment; but there are record facts we may consider, viz., the bonds are voted, are valid, are issued, and nothing is suggested standing in the road of a sale when necessary. In fact there are $75,000 more that can be devoted to the viaduct as a *dernier ressort.* We take the ordinance devoting these bonds to the construction of the viaduct as potentially equivalent to the cash for the purposes of this case, viz., the good faith of the city in the proceeding.

(c) The ruling just made disposes of some other objections to the admission of evidence we deem not vital enough to enumerate and consider *seriatim.*

VII. *Of the validity of the ordinance 8316 filed in the circuit court as the basis of the proceeding.*

This ordinance is voluminous and it would swell this opinion beyond reasonable bounds to reproduce it

*in haec verba*; it will do to deal with summary and substance, of which more presently.

The ordinance is assailed from many different angles by different counsel. We will formulate propositions in condensed form, which, when properly ruled, seem to us to cover essential features of appellants' briefs.

In some of them the ordinance is challenged from the view point of its admissibility in evidence. In others it is assailed from the view point of its validity. At bottom one is the same as the other for practicable ends. We shall approach the subject from the angle presented by the question: Is the ordinance valid? If valid, its admissibility goes as of course.

(a) Its invalidity is argued because it does not carry an appropriation for the building of the viaduct and the certificate of the comptroller that funds therefor are in the city's treasury and unappropriated otherwise.

Ordinance: No Appropriation.

Ordinances devoting bond and contract proceeds to the construction of the viaduct, were technically not appropriation ordinances, yet, observe, the time had not yet come when the improvement had reached the stage when a contract for constructing the viaduct was to be let or could be let and money appropriated therefor. As we understand it appellants' point does not touch that phase, but if we misunderstand their position then a sufficient answer has been made already.

To get at appellants' real point a *resume* of ordinance number 8316 is profitable, thus:

Section 1 ordained that Twelfth be widened, and condemns described property as an easement or right of way for an overhead easement for a viaduct, certain other tracts to be taken for public use, and condemns the right to construct and maintain a viaduct, describing the right to be condemned for an overhead

easement, and ordains that just compensation for the property and easement taken should be assessed.

Section 2 relates to the construction of a roadway on Beardsley street—a street theretofore condemned and opened under two other named ordinances to be used as an approach to the viaduct and which roadway is declared to be a part of one general public improvement known as the Twelfth Street Trafficway.

Section 3 relates to the regrading of certain parts of Twelfth, Washington, Pennsylvania, Jefferson and Summit streets in accordance with a re-established grade.

Section 4 creates a benefit district to pay the compensation for taking and damaging property, acquiring said easements and the opening and widening of Twelfth, and damages on account of regrading all streets named.

Section 5 relates to the issue of condemnation fund certificates under a specified article of the charter to pay for property taken or damaged exclusive of assessments to pay damages, under article 7 of the charter, on account of change of grade in highways.

(*Note*: The last item of damage has already been paid in by the city as heretofore pointed out at the entry of judgment below.)

This section connects itself with a named resolution passed by the Board of Public Works recommending the passage of an ordinance in the premises as provided in section 25, article 13, of the charter.

Section 6 relates to the payment of the costs of regrading the cross streets so as to conform with the regrade of Twelfth.

Section 7 provides for the construction of a viaduct, describing its width, length, grade and materials, etc., and declares that it shall be built in accordance with the general plans theretofore prepared and approved by the Board of Public Works and now on file

in the office of said board showing the location and description of the improvement as a whole.

(We shall have something more to say of these plans further on.)

Section 8 declares that in the regrading and reconstruction of Twelfth street and the building of the viaduct, the fills and cuts of earth and rock are so large and unusual as to impose too heavy a burden on the land in the benefit district as limited in section 3, article 8, of the charter. Accordingly, it provides that $325,000 should be paid by the city out of the proceeds of Trafficway bonds for the actual work of regrading Twelfth and the construction of the viaduct—the remainder to be charged as a special tax on parcels of land benefited, with exceptions and exclusions named in the section.

(*Note*: As heretofore pointed out, by a separate ordinance $75,000 more of the proceeds of the Trafficway bonds have been pledged and devoted to the construction of the viaduct. We construe this section to be a legislative declaration of the intention of the city to create a benefit district and use its charter power to assess benefits and damages for the building of the viaduct *in case that course is necessary*. By another ordinance introduced in evidence the city found and declared as a legislative act that the assessment of damages and benefits to build the viaduct in view of the $400,000 appropriated in bonds and the $200,000 contracted to be paid by the railway company, would not likely be necessary. We further construe it as making a showing of corporate intention and action as distinguished from mere oral testimony. This, to meet the requirements of this court when the case was here before.)

Section 9 is the usual declaration in such ordinances limiting the liability of the city.

Section 10 recites that private property may be disturbed or damaged the owners of which may be law-

fully entitled to remuneration under the Constitution of this State, and ordains that payment of compensation for private property so taken or damaged shall be made by special assessments on a benefit district, or out of the general fund of the city.

(*Note*: A part of those damages have already been paid by the city and the residue assessed on lots in the benefit district, as hereinbefore set forth.)

The section then goes on to ordain that the damages shall be ascertained in one court proceeding as provided in sections 16 and 21 of article 6 and section 4 of article 7 of the charter and points out charter procedure for service of notice and special assessments by reference to certain other sections and articles of the charter.

Section 11 ordains that the improvement provided for, including changes of grade, the building of the viaduct, retaining walls, etc., shall be constructed in accordance with the general plans adopted and approved by the Board of Public Works and now on file in its office showing the location and description of the improvements as a whole.

Section 12 is a finding by the common council that the Board of Public Works has caused such plans to be prepared, and sets forth when they were adopted by the board and when filed, and further declares and finds that this ordinance, to-wit, 8316, was approved and its passage recommended by such board by a certain resolution adopted on a certain date.

Section 13 sets forth the different component parts of the improvement, to-wit, the grading, regrading, the construction of the viaduct and the taking of private property by condemnation, etc., etc., are deemed parts of one general public improvement to be known as the Twelfth Street Trafficway, all as provided in section 16 of article 6 of the charter, and provides that said improvement is hereby provided for and authorized.

Section 14 relates to retaining walls and other supports, etc., and provides that those not hereinbefore provided for shall be paid for either out of the general funds or the proceeds of the Trafficway bonds.

Section 15 repeals certain ordinances and parts of ordinances in so far as they conflict with this ordinance.

We have set forth the substance of the ordinance, not that all its provisions are involved in the point now in hand, but the *resume* will be useful as a reference in disposing of other points presently discussed.

Article 4, section 13, of the charter forbids to the council, or any department or officer, authority to make any contract or do any act binding (or imposing) upon the city any liability to pay money unless the same is first appropriated for the liquidation of all pecuniary liability under said contract or in consequence of said act, and limits the liability of the city under such contract or act to the amount of money so appropriated or set aside.

Section 2, article 3, of the charter requires appropriating or paying ordinances to be referred to the comptroller and to bear his indorsement that sufficient unappropriated money stands to the credit of the fund, etc., therein mentioned, to meet the requirements of such appropriating or paying ordinances, etc.

Now, ordinancce 8316 bore no such indorsement and, as said, the argument runs on the theory it is void for that reason.

On that contention we make these observations:

As said, the Trafficway has not reached the stage where a contract has been let or is to be let for the construction of the viaduct. As said, the damages for regrading have already been paid by the city; and the damages for condemning property and easements have already been assessed against lot-owners in the benefit district. So, as said, the funds out of which the via-

duct is to be constructed are provided for
in fact or potentially. In view of such con-
ditions it would not seem the indorsement
of the comptroller on ordinance 8316 was an essen-
tial. This because the ordinance was not of the char-
acter within the mischief struck at by the charter pro-
visions referred to. So, construction contracts cannot
be let except by ordinance under the charter plan for
public bidding on public works, and when that time
comes the city, as said, has provided funds subject to
appropriation in the line of ways and means and pre-
sumably will make timely technical appropriations
necessary, carrying the proper indorsement of the
comptroller.

How, within the bounds of good sense, could ap-
propriations rest on mere *estimates?* Why not wait
till the real figures are known on actual bids? Why
should they be made prematurely, to the embarrass-
ment of the town? Charter provisions in question were
directed to keeping the city on a cash basis. They
become operative, therefore, at the precise time they
become useful to that end, not before. Not only
do the reason and good sense of the thing lie with
the views announced, we think, but appellants' indus-
trious and versatile counsel, who surely have left no
stone unturned in their clients' behalf, have been un-
able to find any direct authority or precedent for their
position.

Mr. Dillon, in his Municipal Corporations, lays
down the general doctrine that such charter require-
ments are mandatory, and that acts and contracts in
violation thereof are null; for they are wisely intended
to prevent the incurring of excessive municipal liabili-
ties or those for which no provision is made. [2 Dill.
Mun. Corp. (5 Ed.), sec. 790.] This court indorses
that doctrine. In a note to that section the author
quotes with approval from Webb Granite & Const. Co.

*Potential Money.*

v. Worcester, 187 Mass. 385, the following, drawing the sound distinction in play here:

"A statutory provision prohibiting any expenditure, or the incurring of any liability, until an appropriation has been made by the council sufficient to meet the expenditure, or liability, 'together with all prior liabilities which are payable therefrom,' *does not include mere estimated liabilities, such as damages for land taken, which have not actually accrued or become payable, but only liabilities which have been actually incurred.*"

The point is ruled against appellants.

(b) It is next argued the ordinance is fatally vague, indefinite and uncertain, hence does not constitute due process. Further, that it yokes up different proceedings and matters in a way unknown to the charter. To borrow the homely and graphic words of counsel below, set forth in one abstract, "they are trying to get a team yoked up in this case that has never been known in the history of the city, or any other city. They have got a *mule, and a horse, and a cow, and a goat all yoked up in one proceeding, which they propose to drive through this proceeding; and it can't be done.*"

(1) Let us look to that. Translated from metaphor into fact, the last objection relates to an attempt to change the grade of an east-and-west street as well as north-and-south cross streets; to condemn land and easements, to assess damages and benefits, grade streets, construct a viaduct, approaches, retaining walls, and recites in some instances and encompasses in others ways and means for paying therefor.

Ordinance: Embracing Many Matters.

The ordinance plan is self-evidently complex, but is complexity a fatal infirmity in an ordinance or law? Are courts, lawmakers and those charged with executing administrative details to falter at facing mere complexity? Is everything to be of an *a, b, c* kind to pass

muster in court? Hardly. So, it is not clear that complexity could be avoided when engineering difficulties are considered, and (which is closer home) when our former decision seems to require such interdependence between the different elements of the plan as make the whole improvement one indivisible composite unit, each part to ride with the other. There does not seem any self-destroying incongruity in the elements of the plan, such as forbid them, or make it impossible for them, to be carried on in one omnibus proceeding. The joinder of different features of the ordinance (barring for the present a certain element reserved for subsequent consideration) is expressly authorized by charter. [Sec. 16, art. 6.] A course allowing one feature to ride with another where the features form one general public improvement, as here, is not unknown to the courts (In re Third, Fourth and Fifth Avenues, 49 Wash. 109, supra; Sears v. Board of Street Commissioners, 180 Mass. 274), and seems sensible.

(2) It is argued the engineering plans and maps on file with the Board of Public Works are too vague and general and that vagueness is a vice in the ordinance itself. Those plans and maps were
Vague Ordinance. not all brought here for our inspection, and giving those here such investigation as our technical knowledge permits we cannot hold that either plans, maps or ordinance are fatally defective for vagueness.

This court would (except in a plain case) be on dangerous and indefensible ground to undertake to substitute its own judgment for that of the city legislature and competent engineers on such questions.

There are subsidiary questions discussed by counsel under this head, but we deem them not vital and pass to one reserved in the foregoing ruling that has given us more trouble than any other, to-wit:

(e)  It is argued the ordinance pretermits all ref-
erence to section 17 of article 6 of the charter.  That
it is based on section 17 in so far as it purports to be
a condemnation of any easement or right of way over
land for the purpose of constructing a via-
Reference
to Wrong     duct thereon, or for widening a street for
Section of   the purpose of constructing a viaduct there-
Charter.
on.  That said section 17 provides the *exclu-
sive* method of accomplishing those things.  That sec-
tion 16 of article 6 (under which respondent justifies)
requires all procedure for ascertaining damages and
the service of notice and the making of special assess-
ments to be conducted under such sections of article
6 or article 7 of the charter as the ordinance or ordi-
nances shall provide, hence, as the ordinance preter-
mits all reference to section 17 (which constitutes, it
is argued, the exclusive authority in the particular
mentioned) the omission is fatal.

The matter is approached from different view-
points in the several briefs of appellants, but the above
sufficiently states the question for our purposes.

It must be conceded the charter requires proced-
ure for ascertaining damages, service of notice and
making special assessments should be conducted un-
der such sections of article 6 and 7 of the charter as
the ordinance'shall provide, and that ordinance 8316
(while referring to diverse sections) does not refer
to section 17.  If, therefore, section 17 is the only and
exclusive charter method for doing what respondent
city undertook to do the point must be ruled for ap-
pellants.  In that event this court, whose bounden duty
is to hew to the line of the law (first taking care to
find the right line to hew to) and let the chips fall
where they may, would not be responsible for the
grievous result whereby the laudable ambition of Kan-
sas City to perform a notable engineering feat for its
own welfare would be thwarted  and its years of labor

and great outlays in expense would be cast to the wind; but the blame would rest elsewhere.

Fortunately we have come to the conclusion that such untoward mishap may be avoided . on legal grounds to be presently stated. To present the point calls for those sections of the charter.

Section 16 reads:

"When the grading or regrading of any public highway, or the grading or regrading of any highway or highways intersecting therewith, or the construction of tunnels, subways or viaducts in, under or upon said public highway or highways, or the taking of private property by condemnation for widening, opening or extending any such public highway or highways, or any or all of said improvements, shall be deemed by the common council to be part or parts of one general public improvement, the common council shall have the power to provide for the same in one and the same ordinance or by separate ordinances. Said ordinance or ordinances may provide for establishing or re-establishing the grade of such public highway or intersecting highway or highways or part or parts thereof, and may provide for such grading or regrading by means of cuts, fills or viaducts, and may provide for building subways or tunnels, and may, in the same ordinance and as a part of the same general public improvement, provide also for the condemnation of private property taken or damaged by such proceeding. Such ordinance or ordinances shall in such case provide also for the payment of compensation for private property so taken or damaged either out of the general fund of the city or by special assessments upon a benefit district, or by both; the damages, if any, caused by such public improvement may be ascertained in one court proceeding or by separate court proceedings in the circuit court of Jackson county, Missouri, at Kansas City, as may be provided by ordinance, and all procedure for the ascertainment of dam-

ages, the service of notice, and the making of special assessments shall be conducted under such section or sections of this article or of article 7 of this charter, as the ordinance or ordinances shall provide. Such ordinance or ordinances shall provide the method by which the damages awarded in such proceeding or proceedings shall be paid, and if said damages are to be paid by special assessment upon a benefit district, said ordinance or ordinances shall fix the boundaries of said district.

"When proceedings are conducted under the provisions of such ordinance or ordinances, the board of public works shall cause plans to be prepared, which said plans shall be identified in the ordinance or ordinances, and shall show the location and description of the proposed public improvement as a whole, and such plans shall be filed with the clerk of the circuit court with a certified copy of said ordinance or ordinances. Any special assessment against property deemed benefited shall be collected in the manner provided in this article.

"Whenever the grading or regrading of any public highway or intersecting highway, or the construction of tunnels, subways or viaducts in, under or upon such highway or highways, or the taking of any private property for the widening, opening or extending of such highway or highways or any or all of such improvements shall be a part of one general public improvement, and shall be provided for in separate ordinances, all of said ordinances or as many as may be necessary to show said proceeding in its entirety may be introduced in evidence, and may be considered by the jury or juries in assessing the damages and benefits, if any, to arise in any one of said proceedings."

Section 17 reads:

"Whenever it is necessary to condemn any land for the purpose of constructing a viaduct thereon or to condemn an easement or right-of-way over any land

for such purpose, or to widen a street, avenue, alley,
boulevard, or other public highway, for the purpose
of constructing a viaduct thereon, or to construct a
viaduct upon a street, avenue, alley, boulevard, high-
way or other public property, or to change the grade
of a highway for any purpose, and such construction
or change may cause a damage to private property,
the ordinance providing therefor, before its passage,
shall be approved by the board of public works, ex-
cept that in case of boulevards under the board of
park commissioners, said ordinance shall be approved
by the board of park commissioners. The board of
public works, or board of park commissioners, as the
case may be, shall cause plans to be prepared, which
said plans shall show the location, length, width and
height of the proposed viaduct, manner of construction
thereof, and the dimensions, character and grade of
the approaches thereto. The board of public works,
or the board of park commissioners, shall then recom-
mend to the common council the passage of an ordi-
nance providing for the construction of such viaduct,
making a reference in said ordinance to said plans.
Such ordinance shall establish the grade of said via-
duct and of the approaches thereto. In case a part or
whole of the damages are to be paid for by special
assessments, the ordinance shall prescribe a benefit
district within which private property is deemed to be
benefited, and such private property within such dis-
trict may be assessed with the benefits, and proceed-
ings therefor shall be begun in the circuit court of
Jackson county, Missouri, by filing with the clerk of
said court a certified copy of said ordinance, together
with a certified copy of the plans of said viaduct; the
court shall require service of notice and publication
thereof to be given as provided in this article where
condemnation cases are begun before the municipal
court. Subsequent proceedings in the circuit court
shall be conducted in the same manner and with the

same effect as in cases of appeals taken in condemnation cases begun in the municipal court, and in such cases a jury shall determine the damage and assess the benefits as provided by section three of this article, and section seven of article 7 of this charter, so far as applicable.

"Whenever it is deemed necessary by the city to condemn a right of way for a subway, tunnel or cut, or to condemn an easement for the construction of the same under private property, or to construct the same under any street, avenue, alley, highway or other public grounds, and private property may be damaged thereby, said proceedings may be originated and conducted in the same manner and with like effect as herein provided in regard to viaducts so far as the same may be applicable."

Analysis makes it plain that those sections are dealing with two separate charter schemes, each intended to be complete within itself. They constitute a charter bow with two strings and the legislative reason for giving power to proceed under either is not a subject of judicial concern. *Stat pro ratione voluntas.* So, two or more legislative plans providing two or more roads even for reaching the same goal are not infrequent in laws. But, in this case, they may be assigned different offices—for example:

Section 16 relates to viaducts as well as to the regrading of highways and for condemnation for widening, opening or extending such highways as are regarded by the common council as *"one general public improvement."* Section 17, on the other hand, relates more specifically to the building of a viaduct and to the condemnation of an easement therefor, which particular viaduct might not be a part of a composite plan constituting "one general public improvement."

But coming closer to the point, it is argued that section 16 does not cover a condemnation of an easement or right of way over any land for a viaduct and

therefore the city must fall back upon section 17 in order to do that thing. That argument must fail if we construe the power of condemnation and "for widening, opening or extending" in section 16 as sufficient basis for the condemnation of an overhead ease-ment for the particular viaduct in question.

We disallow the point to appellants and put our ruling on the following propositions:

(1) In the first place under the Constitution and an act known as the Enabling Act, Kansas City has

**Exclusive Method.**

power to provide by its charter for as many methods to meet the varying phases of con-demnation for street improvements, and the exercise of the power of eminent domain and tax-ation by way of special assessments, as it sees fit, so long as they do not contravene the Constitution or the general policy of our laws. [Kansas City v. Oil Co., 140 Mo. 458; Brunn v. Kansas City, 216 Mo. 108; Kan-sas City v. Bacon, 147 Mo. 259; State ex rel. v. See-horn, 246 Mo. 541.]

Giving heed to that proposition the charter com-posite scheme followed in ordinance 8316 must be given effect by the courts, if possible so to do without violence to guiding and settled principles of law. In-deed, the charter scheme evidenced by section 16, wherein one element rides forward with the others, is within the *rationale* of Kansas City v. Railroad, 230 Mo. 369, and the intendment of ordinance 8316, passed after the opinion in that case went down, with an eye to it.

(2) For a little way in the bottoms, to pre-vent great cost and damage in widening Twelfth street

**Extending Easement Beyond Street Line.**

on the surface, an overhead easement is condemned not only above Twelfth but widening out a little over some adjacent abutting property at one point. We see no reason why this is not permissible as an element in the whole improvement. The

city did not have to go to the full extent of its ulti-
mate power in condemnation proceedings. It could
stop short of its full power, taking only what was
necessary—in this case, an overhead easement spread-
ing out for a little way over abutting property. Such
is within the reasoning of St. Louis, etc. Railroad v.
Clark, 121 Mo. 169—*vide,* separate opinion of BLACK,
J., p. 188, et seq. The cases cited therein sustain the
proposition that the condemning power need not use
its ultimate right, but may condemn a smaller right
and a lesser easement than an exclusive right, and so
in substance we held in that case.

(3) The authorities hold, in effect, that the con-
struction of a viaduct or its approaches within street
lines is merely a change of street grade.
Viaduct: Willis v. Winona City, 59 Minn. 27, and
Change
of Grade. Sauer v. New York, 206 U. S. 536, are in
line with that idea. And agreeable thereto
are many cases cited by respondent in its brief.

It will be observed that section 16 of the charter
not only provides for a viaduct, but for widening the
street. We can see no difference between widening a
street and widening an overhead easement in the line
of the street so as to allow the viaduct to overhang
abutting private property. That is but a widening of
a street in a limited sense. Now, section 16 of the
charter provides for grading or regrading of any high-
ways, the construction of a viaduct, etc., the condemn-
ing of property therefor, etc., and goes on to say that
the city may provide for such grading or regrading by
means of cuts, fills or viaducts. If the construction
of a viaduct to all intents and purposes is nothing but
the change of grade of a street and if the widening of
the overhead easement at one point is nothing more
than a widening of a street, then both objects are with-
in not only the letter but clear intendment of section
16. In that view of it, it was not necessary for the city

to exercise the power conferred in section 17 or to refer to that section in ordinance 8316.

Appellants are not directly affected in any way by the widening of the easement in the bottoms; for their properties are uptown. Their real grievances pertain to their damages, which, as seen, have been assessed. But all the evidence upon which their benefits and damages were assessed was not brought here, nor is the point made that the verdict was not warranted by the testimony. In this court their attacks are alone directed to the validity of the proceeding as a whole.

Propositions ruled cover and dispose of minor ones urged, but not specified in the opinion. We have pursued the matter far enough.

On the whole record the judgment should not be disturbed. Let it be affirmed. It is so ordered. *Brown, Bond, Walker* and *Faris, JJ.,* concur; *Woodson* and *Graves, JJ.,* dissent.