CHAMP PHILLIPS, by his Next Friend, Respondent, v. HAMILTON BROWN SHOE COMPANY, Appellant.

Kansas City Court of Appeals, March 2, 1914.

1. NEGLIGENCE: Guarding Machinery: Application of Statute. Section 7828, R. S. Mo. 1909, requiring machines in manufacturing establishments when so placed as to be dangerous to be safely and securely guarded if possible, and if not, then notice of its danger to be posted, applies not only to a machine which is so placed as that its normal and proper operation is dangerous to employees by reason of their liability to come into contact with it, but also to that machine which is so located as to be dangerous by reason of breakage and flying particles

Phillips v. Shoe Co.

caused by its ordinary operation when the breakage and flying particles are of such frequent and ordinary occurrence as to give reasonable ground to anticipate injury to an employee.

2. ———: ———: ———. The master is not required to guard against such dangers or accidents as no human knowledge or experience could anticipate.

3. ———: ———: ———: Assumption of Risk. Where the injury arises from a failure to obey the statute, the doctrine of assumption of risk cannot apply because that would, in effect, repeal the statute.

4. ———: ———: ———: Contributory Negligence. Under the facts of this case the act of the plaintiff in continuing to work at the machine after knowledge of the danger was assumption of risk rather than contributory negligence. But if there is a point at which assumption of risk shades into contributory negligence the danger must be so glaring and obvious that a person would not attempt to work there. In view of the fact that plaintiff was a minor 18 years of age, and other employees had worked at the machine without injury, he was not guilty of contributory negligence as a matter of law.

5. ———: ———: ———: ———: Evidence of Subsequent Guarding. In this case, by virtue of the statute, the possibility of guarding is an issue in the case. And where defendant contends that it is impossible to guard the machine because the guard will prevent the operator from seeing the work, evidence that the machine was subsequently guarded is admissible to prove this issue but not to prove negligence. Evidence is admissible, if competent, upon any material controverted fact. If a party wishes to limit the evidence to such fact, he should request the court to so limit it. If the subsequent guard were an invention discovered later it might not be admissible, but where it is so simple in character as a leather strap, which must have occurred to a prudent man at any prior time had he given the matter attention, its subsequent use cannot be excluded on the ground that it was a subsequent discovery or invention.

6. DAMAGES. There can be no recovery for future damages unless the evidence shows they are reasonably certain to happen.

7. ———: Instruction Combined with Erroneous Argument. Plaintiff lost an eye but there was no evidence showing any reasonable probability of losing the other eye. One of plaintiff's instructions authorized the jury to give damages for loss of his eyesight and for his future inability to earn a living. Upon this instruction an argument was made that the jury should take into consideration the fact that the other eye might be lost. Defendant objected, but the court did not correct the ar-

gument. Under these circumstances the jury would naturally be led to think that they could award damages covering the possibility of the loss of the other eye when there was no evidence that such would likely occur. This was error.

Appeal from Boone Circuit Court.—*Hon. D. H. Harris,* Judge.

REVERSED AND REMANDED.

*McBaine & Clark* for appellant.

*Fry & Rodgers* and *Harris & Finley* for respondent.

TRIMBLE, J.—This case involves the construction to be placed upon section 7828, Revised Statutes 1909, which provides that "the belting, shafting, machines, machinery, gearing and drums, in all manufacturing, mechanical and other establishments in this State, when so placed as to be dangerous to persons employed therein or thereabout while engaged in their ordinary duties, shall be safely and securely guarded when possible; if not possible, then notice of its danger shall be conspicuously posted in such establishments."

The question for solution is, does the statute apply only to that machine which is so placed as that its normal and proper operation is dangerous to employees by reason of their liability to get into contact with it? Or does the statute also cover that machine which is so located as to be dangerous by reason of breakage and flying particles caused by its ordinary operation when the breakage and flying particles are of such frequent and ordinary occurrence as to give reasonable ground to anticipate injury to an employee? Plaintiff claims the statute applies to both; that it is intended not only to protect employees from the danger of coming into contact with machines or machinery, but also to protect them from injuries due to breakage and flying par-

ticles in the usual and ordinary prosecution of the work. Defendant insists that the statute must be given only the first and narrower construction.

The suit is for damages for the loss of an eye caused by a particle of steel, consisting of a piece of the "driver" used in a tacking machine to force tacks, which are bits of a small wire, into leather soles in sewing them together.

The machine in question is known as a cable wire tacking machine. These machines are placed in pairs on large tables with their backs to each other so that the operators of the machines are on opposite side of the table and facing each other. The machine was run by a small belt connected with a pulley on the back part of the machine and a shaft overhead. The operator stood in front of the machine and, after placing the sole to be tacked under the arm on the machine, applied the power by pressing a treadle under the table. As long as the treadle was pressed the iron bar, holding in its end the "driver" by a set screw, would fly up and down, like the needle in a sewing machine, at the rate of about 400 strokes per minute. The cable wire, from which were cut the tacks, was a small wire wound in a large wheel above the operator's head, and was fed down into a groove where it was cut into proper lengths for tacks, and as each tack was thus cut from the wire it was pushed by the "driver" down the groove and into the sole in the same way the needle in a sewing machine is forced through the cloth. The wire used in making these tacks was fifty-five thousandths of an inch in diameter. The "driver," extending perpendicularly downward from the end of the driver bar and fastened therein by a set screw, was necessarily slightly smaller than the wire tack, since it had to go down the groove and force the tack into the leather. This "driver" is, therefore, a needle-like piece of steel about four inches long and tempered to a

blow, that is, tempered to a point where it will break before it will bend.

In operating the machine the "driver" would fly up and down with great rapidity striking the cut-off lengths of wire and driving them as tacks into the sole leather. Owing to the smallness and temper of the driver, and the power with which it struck the tacks, it could not withstand the force of the blow and frequently broke and flew with great force out towards the operator. They broke on all the machines from two to twelve times a day. Sometimes the broken particles of the driver would strike the operator on the hands and arms and sometimse on the body and face. They went with great force as if shot from an air gun and when striking the bare skin would sting and draw blood, and sometimes would stick in the flesh and the operator would have to pull them out. These drivers had been accustomed to break and had been doing so for some time, and a supply of them were kept in a box to replace a broken one when necessary.

While the plaintiff was operating one of these machines the "driver" broke and a piece of it struck him in the left eye destroying its sight. He had been working at the machine for five weeks and during that time the drivers broke very frequently from two to twelve times a day. In working the machine the operator was compelled to stand facing the driver which worked in rapid vertical motion and about two feet from the operator.

The petition alleged that defendant knew, or by ordinary care might have known, that said "driver" frequently broke and threw particles thereof toward the operators with great force, and knew, or by ordinary care might have known, that said machine was dangerous to the operator unless there was a guard on said machine so as to prevent said pieces from striking the operator, and knew or might have known of the dangerous nature of said machine before the

injury in time to have placed a guard thereon but negligently failed to do so; that it was possible to have safely and securely guarded said machine so as to have avoided injury to plaintiff from the breaking of said driver while plaintiff was employed about said machine and engaged in his ordinary duties; and that plaintiff's injury was caused solely by reason of defendant's failure to guard.

The answer was a general denial, coupled with pleas of contributory negligence and assumption of of risk. Upon a trial a verdict for plaintiff for $10,000 was returned. The court compelled a remittitur of $4000 and overruled defendant's motion for new trial. An appeal was taken to the Supreme Court on the question of the unconstitutionality of the statute. Before this case was reached, however, the Supreme Court upheld the constitutionality of the statute in the case of Simpson v. Witte Iron Works, 249 Mo. 376, and thereupon transferred this case to this court.

As stated at the outset the main question to be disposed of is, Does the statute apply to a case of this kind where the injury is not caused by the employee coming into contract with an unguarded machine, but is caused by the lack of a guard to prevent broken pieces from flying from the machine when such breakage is of such frequent and ordinary occurrence as to notify the master that the machine as located and operated is dangerous and likely to injure employees?

We can see no reason why the statute should be given the narrow construction contended for by defendant. When it became a statute it was entitled "An Act relating to . . . the employment, *safety, health* and work hours of employees." [Laws 1891, p. 159.] It is true that at common law a master did not have to guard his machinery, but was only required to furnish the servant with a reasonably safe place and reasonably safe appliances with which to work. And while the statute may be rightfully said

to be in derogation of the common law, yet it is "one of the wisest and most humane statutes to be found upon our statute books, because it is remedial and highly salutary." [Cole v. Lead Co., 240 Mo. l. c. 407.] In other words, because it is in derogation of the common law it should not be stretched beyond the limits of its express terms, and yet, because of its remedial character, courts should not seek to place a narrower construction upon it than its words, when read in the light of their beneficent object, will require. As said by Lamm C. J., in Simpson v. Witte Iron Works, 249 Mo. l. c. 400, "Judicial attention is to be fastened on its letter and it is not to be aided by mere equitable intendments. However, it is a highly remedial and salutary act, made necessary by changed and inflamed conditions, and hence should be approached in no hostile or indifferent spirit, as if to drive a coach-and-six through it and break down its efficiency by strained or overnice construction."

Prior to June 14, 1909, the statute did not contain the words "machines, machinery" but only applied to "belting, shafting, gearing and drums." Consequently, the courts in construing the statute confined its scope to the above specified agencies by which power and motion were transmitted. On said last named date, however, the statute was amended so as to include "machines" and "machinery." [Laws 1909, p. 502.]

As the statute now stands it is not limited to dangers arising solely from those enumerated parts of a machine used to transmit power and motion. Nor is it confined to those dangers arising by reason of the employee's coming into contract with the machine while in its normal operation. What does it say? In plain words it says: "The . . . machines . . . in all manufacturing . . . establishments in this State, when so placed as to be dangerous to persons employed therein or thereabout while engaged in their

ordinary duties, shall be safely and securely guarded when possible." And the object of the statute is the *safety* of the employee. It would seem that if that safety would be imperilled either by the employee's inadvertently coming in contact with the machine or by the machine's working in such way as to give notice that it was likely to actively injure the employee, the machine would be "dangerous to persons employed therein or thereabout" within the meaning of the statute. The statute does not say "dangerous *by reason of the likelihood of employees coming' in contact therewith"* but simply says "when so placed as to be *dangerous* without qualification, limitation or explanation as to the manner or way in which it becomes dangerous. Of course the danger that must be guarded against is a danger that can be foreseen by ordinary human foresight. The master is not required to guard against such dangers or accidents as no human knowledge or experience could anticipate. [Colliott v. Am. Mfg. Co., 71 Mo. App. l. c. 171.] But if the machine or machinery is such that it is *known* to be dangerous to employees from any cause, either actively or passively, what warrant have the courts for cutting down the scope and effect of the statute by strained judicial construction saying that the statute does not mean "dangerous" without qualification, but only "dangerous" by reason of the employee's likelihood of coming into contact therewith?

We do not think the words "when so placed" should be interpreted to indicate or imply the source from whence the danger arises or the kind of danger. They have reference only to when dangerous machinery shall be guarded, that is, when by reason of the location of the machine the danger is likely to become effective and operate upon the employee.

In the case of Strode v. Columbia Box Co., 124 Mo. App. 511, l. c. 516, Judge GOODE of the St. Louis Court of Appeals discusses this feature of the stat-

ute, and, in answering the contention in that case that the statute intends only to afford protection against such accidents as may occur from contract with the machine while in motion, quoted a long list of authorities and then said: "Those decisions cannot be said to accept appellant's proposition, that such statutes are not intended to protect employees from injuries due to breakage or other mishaps to machinery. What they unquestionably decide is that when a machine, which otherwise the statute would require to be guarded is located where there is no reasonable ground to anticipate injury to an employee either from its proper and regular motion, or from some erratic movement outside its usual orbit, the master is not responsible for an injury caused by it though unguarded. The statute is remedial and its efficacy ought not to be weakened by interpretation. If belts, shafts, gears and drums are accustomed to fly from their proper positions in consequence of breaking or slipping, and it is possible to guard them so as to prevent their movements from hurting employees, the language of the law is broad enough to require guarding. To rule otherwise would defeat, in part, the object of the Legislature which is shown by the title of the original act to have been the promotion of the safety and health of employees. [Session Acts 1891, p. 159.] Whenever an appliance of the given kind is so placed as to endanger employees in the performance of their regular tasks, either by their coming into contact with it, or it with them, the duty to fence arises if it is possible to do so. Suppose belts are in the habit of slipping off their drums and flying about in a dangerous way, why should this risk not be minimized if possible?"

The above language is peculiarly applicable to the case at bar as it is much more certainly within the statute than was the case from which it is quoted. The Strode case was where a belt, working on an overhead pulley and out of reach, could not be dangerous unless

it broke or came off the pulley. Consequently, the court held that as there was no evidence to show that belts frequently broke whereby the master could have anticipated that the injury would be likely to happen and that the machinery was therefore dangerous, not because the servant could come in contract with it but because it was likely to fly out and strike the servant, therefore the master was not liable. And, as such evidence as to the frequent breaking of the belts was wanting, the case was reversed and remanded.

In the case at bar, it is not disputed that the "drivers" would frequetly break and fly with great force against the face, arms, and body of the operator; that they would go as if shot from an air gun and when they struck the bare skin they would string and draw the blood and sometimes stick in the flesh and have to be pulled out. So that it would seem this case would come much more clearly within the statute than the Strode case, since the danger was the usual accompaniment of the operation of the machine and not an isolated and unusual occurrence like the breaking of a belt. And the direction in which the particles would fly was also known, which was not known in the Strode case.

It is urged here, as it was in the Strode case, that the fact the statute provides for a notice to be put up, in case it is impossible to guard the machine, shows that it was intended only to prevent the employee from coming in contact with the machine, because, in case of breakage, notice on the walls would serve no purpose. But, as said by Judge GOODE on p. 517, "the notice might prevent a person from accepting a task which would expose him to the risk of injury from an unscreened and dangerous appliance. Hence it is not obvious that the requirement of notice aims at no purpose except to warn employees not to get against the machine. It aims to have them warned of the risk accompanying a given task in proximity to an unfenced

appliance. But this requirement is, at most, only part of the duty imposed on proprietors and does not of necessity limit the duty of guarding imposed in the preceding clause, to instances where employees may get against a dangerous appliance. It means no more than that when there is a piece of machinery which cannot be guarded, and which is liable to hurt an employee, he shall be warned. It is no corollary of this proposition that when the mode in which injury may be inflicted is by an irregular movement of an appliance it need not be fenced. We have found no case in which this question was much discussed; but in Hintle v. Birtwistle, L. R. 1. Q. B. (1897), p. 192, a decision on an English factory act not materially different from ours, the court uttered relevant remarks. In said case the injury was due to an arratic movement of a shuttle. The opinion assumed that the statute required the shuttle race to be screened if the accident could have been anticipated.''

It is true, in the case of Findlay v. Columbia Box Co., 158 S. W. 22 l. c. 25 (not yet reported in our state reports) the Supreme Court of our State make some remarks which appear to disapprove of the view taken by Judge GOODE. A careful examination of the language of the Supreme Court will disclose, however, that the court is not talking about whether the statute should be confined to cases where the servant is liable to be injured by coming in contact with the machine, or without regard to the facts as to what caused the injury. The Supreme Court is merely saying that the statute was not "intended to insure against *accidental* breaking." In that case and also in the Strode case the injury was caused by the breaking of a belt and the end of it struck plaintiff. The belt was forty-two feet long. Only a small portion of it came into the room where the employee was. *There was no way of knowing when or where a belt would break, nor where it would fly* when it did break. Its breaking was more or

less unusual, and was not the accepted and expected accompaniment of the operation of the machinery. Consequently, the view necessarily argued for by plaintiff in the Findley case was that the statute covered machinery *whenever* it was liable to break without regard to the nature of that breaking, whether it was unusual, accidental or otherwise. It was in answering this argument that the court uses the language above referred to. And the court nowhere says the statute is limited without qualification to guarding against danger from contact with the machiery. But by its discussion the court shows that the statute did not apply *to the facts of that case,* and on page 26 closes by saying: "We think that to hold that the statutory liability exists *in this case* would amount to the making of a judicial rule," etc. (Italics ours).

Of course, if the breaking of these "drivers" was an unusual occurrence, the machine could not be said to be "dangerous" within the meaning of the statute. And if there was no way of telling where the broken pieces would fly, then, of course, as said in the Findley case, page 25, "to guard them in the sense suggested would exclude all access to them and in many cases materially embarrass their operation." Nor could it be said that a machine was "so placed as to be dangerous" if the injury was caused by an accidental breaking and no one could tell where the pieces would fly. But in the case at bar, owing to the recurrent frequency and certainty of the breaking and the well known direction in which the pieces flew, certainly the machine was dangerous and was so placed as to be dangerous, and should have been guarded if possible. Such being the case, the machine comes squarely within the plain, explicit terms and provisions of the statute as it is written.

There is no doubt but that many cases may be cited which use language saying in effect that the statute was intended to protect the servant from coming

in contact with the machinery. And that is true, it was so intended; but the question here is, was that its *only* purpose and scope? It will be noticed that all such decisions, except those hereinabove mentioned, were dealing with cases where the servant received the injury by coming into contract with the machinery, and the question in dispute was not whether the statute covered cases where the machine actively did the injury, but whether the statute required the guarding of the *parts which did the injury*. And many of the cases were decided upon the statute before it was amended so as to make it applicable to machines and machinery as well as to belting, shafting, gearing, and drums which, in their normal operation, were mere agencies to transmit power and motion.

We have not had our attention called to a case in which the Supreme Court has held that the statute does not cover. a case where the peculiar facts are as stated in this particular case. We do not mean to hold that the statute was intended to cover all cases of breaking or mishaps, such as the breaking of a belt or the explosion of a boiler or the sudden and unanticipated going awry of a machine. But we do hold that if the breakage and danger are the expected and usual concomitants of the ordinary operation of the machine, and could be foreseen by ordinary prudence, then the machine is a dangerous machine and should be guarded if possible.

If the statute cover the machine in question, then the doctrine of assumption of risk cannot apply, because to allow this rule to have sway would be to judicially repeal the statute. [Austin v. Bluff City Shoe Co., 158 S. W. 709, l. c. 715; Gray v. Grand River Coal and Coke Co., 175 Mo. App. 421, 162 S. W. 277.]

Under the facts in this case, the act of the plaintiff in continuing to work at the machine after knowledge of the danger constituted assumption of risk rather than contributory negligence. Because the dan-

ger arose, not from any negligence or act of omission on the part of the servant, but because of a danger inherent in the nature of the work, if the machine was not guarded. If the danger is one growing out of and directly connected with the work the servant is doing, it is assumption of risk for the servant to continue therein. But if the trouble is caused by the negligence of the master unconnected with the work, that is, with the inherent nature of the work and the necessary method of doing it, or if the trouble arises by reason of the negligence of the servant, then the question becomes one of contributory negligence. The distinction between contributory negligence and assumption of risk lies in the different states of mind in which they are rooted. Negligence is the result of inattention or oversight; assumption of risk implies knowledge of danger and willingness to encounter it. [Dean v. Woodenware Works, 106 Mo. App. 167 l. c. 179; Adolph v. Columbia etc. Co., 100 Mo. App. 199 l. c. 209; Dale v. Hill-O'Meara Construction Co., 108 Mo. App. 90 l. c. 97; Charlton v. Railroad, 200 Mo. 413, l. c. 433.] See also the remarks of Justice Holmes in Schlemmer v. Buffalo etc. Ry. Co., 205 U. S. 1, l. c. 12. Speaking of the difference between assumption of risk and contributory negligence, he says the difference between the two is one of degree rather than one of kind, since there comes a point at which one shades into the other; but when a statute exonerates a servant from the former and still leaves the latter open to the master as a defense, great care must be taken not to sacrifice the servant's rights by simply charging him with assumption of risk under the name of contributory negligence. This is peculiarly applicable here because the facts on which plaintiff's contributory negligence is sought to be based show that it is not contributory negligence of which the servant is guilty, but that he assumed the risk. For us to hold him guilty of contributory negli-

gence is to deprive him of the benefit of the statute by calling his act contributory negligence when in fact it was not contributory negligence but was assumption of risk. But, even on the view that it was contributory negligence for him to work at the machine, unless the evidence, viewed most favorably to plaintiff, shows negligence by him so clearly that reasonable minds cannot differ thereon, we cannot say he is guilty of contributory negligence as matter of law. [Miniea v. St. Louis Cooperage Co., 158 S. W. 1006.] It cannot be so declared unless the danger was so glaring and obvious that a person would not attempt to work there, especially in view of the fact that plaintiff was a minor eighteen years of age, and there was evidence showing that other employees had worked there and had not been hurt. [Jewell v. Bolt and Nut Co., 231 Mo. 176, l. c. 201-2. See also Breshears v. United Iron Warks Co., 157 S. W. 360; Panck v. St. Louis Beef Co., 159 Mo. 467, l. c. 477.] In the case before us the negligence charged against the master is that it failed to guard when it could have done so. The evidence tends to show that a failure to guard was the real cause of the injury, and nothing that the plaintiff did or failed to do had any part therein. In all of the cases cited as holding the plaintiff guilty of contributory negligence, such negligence was bottomed on some act, or omission to act, on the part of the employee which he should not or should have performed in the exercise of the prudence of an ordinary man.

It is urged that the court committed reversible error in admitting testimony showing that after the injury to plaintiff's eye the machines were guarded by pieces of leather about eight inches long and three-and-one-half or four inches wide and held in place over the driver by a wire.

It must be borne in mind that in this case the statute makes the possibility to guard *an issue in the case.* And the petition alleged that it was possible to guard

it and the answer denied it. This issue of fact, namely, whether it was possible to guard the machine, is separate and independent of every other issue in the case. Consequently, the evidence was admissible as tending to prove that issue. Did it not, therefore, come within the rule that where evidence is admissible to prove one fact it cannot be excluded merely because it is not admissible to prove some other fact?

The manner in which the testimony was elicited shows that it was offered as bearing solely on the issue of whether or not the machine could have been guarded. It is as follows:

"Q. Do you know whether the machine can be guarded there so as not to interfere with the working of the machine? A. Yes, sir. Q. *How do you know that?* A. Because there has been one put on my machine.

By Mr. McBaine: We object and ask that the answer be stricken out as not tending to prove any allegation alleged in the petition.

Which objection the court overruled, to which action of the court, the defendant, by its counsel, then and there at the time duly excepted and saved its exceptions.

By Mr. McBaine: And as being an improper method of proving whether guards could be put on.

By Mr. Rodgers: It is the best method I know of.

Which objection the court overruled, to which action of the court the defendant, by its counsel, then and there at the time duly excepted and saved its exceptions."

It also shows that the ground of objection was that it was "an improper method of proving *whether guards could be put on.*" The defendant's witnesses testified that in their opinion it was not possible to guard the machine as the guard would prevent the operator from seeing the work. Therefore, evidence that a guard was used on the machines in operation

every day from October 1st down to January, the date of the trial, would be admissible to establish the issue that the machine could have been guarded and to controvert the evidence that it could not have been guarded. Evidence is admissible if competent upon any material controverted fact. And if a party wishes such evidence to be limited to that fact, he must move the court to so limit it, and if he fails to do this no assignment of error can be based on it. [State v. Phillips, 24 Mo. 475, l. c. 484.] But in this case the very nature of the questions asked limited it to the one issue. And the objection did not call the court's attention to the fact that the testimony was not admissible to prove any other fact or issue.

In the case of Bailey v. Kansas City, 189 Mo. 503, it was held, in a suit for damages for a negligent defect in a sidewalk, that evidence showing that the city shortly after the injury repaired the sidewalk, would have been admissible as tending to show that the place was a street of the city, had that been an issue in the case, although it was not admissible to show that the city regarded the sidewalk as defective. In that case the question whether the sidewalk was a city sidewalk had been taken out of the issues by an admission that it was such a sidewalk. But the court held that, *had it been an issue in the case,* the evidence of subsequent repairs would have been admissible. In the case at bar the question of whether the machine could have been guarded remained an issue in the case throughout.

In Carle v. City of DeSoto, 63 Mo. App. 161, l. c. 166, Judge ROMBAUER said: "The rule in this State has always been that evidence which is admissible for any purpose, cannot be excluded by the court. The court may limit the effect of such evidence when admitted, and is bound to limit it by instruction when requested to do so by the party complaining. [Union Savings Association v. Edwards, 47 Mo. 445; State v.

Phillips, 24 Mo. 475, loc. cit. 484; Morrison v. Yancey, 23 Mo. App. 670, loc cit. 674.]''

Again, as observed above, the objection made did not call the attention of the court to the inadmissiblity of the evidence as tending to show negligence of the defendant, that is, to the real ground upon which the objection is now placed. In Schmidt v. St. Louis Ry. Co., 163 Mo. 645, l. c. 651, Judge VALLIANT says, ''The objection should be specific enough to inform the court and opposing counsel of the real ground on which it is based.''

In the cases wherein the rule against admitting evidence of subsequent repairs was established, the issue upon which it was sought to introduce the evidence was the issue of defendant's negligence. But it was not offered on that issue in the case at bar. The manner of its presentation shows it was not, and the objection shows that also. If we allow the objection to prevail now, we will give it force although put now upon a ground not urged in the trial court. We have recently had occasion to consider the sufficiency of an objection that did not point out the specific ground on which it was finally urged, in an opinion by ELLISON, P. J., on the motion to certify in the case of Burton v. Railroad, decided January 19, 1914 (162 S. W. 1067) and not yet reported in the State Reports. However, in the opinion of the writer, the evidence was admissible even though the objection had been specific, because the question whether it was reasonably possible to guard it was an issue in the case, made so by the statute.

It cannot be said in this case, that the evidence was not admissible because the subsequent guard was an *invention* discovered later and for that reason defendant should not be blamed for not using it. Because the guard was in no sense an invention, it was simply a leather strip in the shape of an eye shade held by a wire just above the driver. In the case of Gloek-

ner v. Harwood Mfg. Co., 122 N. W. 465, l. c. 466, it is said: ''But the burden is upon the party charging negligence to prove, not only a dangerous condition, but also that it was feasible to guard. The practicability of guarding dangerous machinery depends upon the character of the machine, its history, the difficulty of attaching a guard without interfering with its efficiency, and upon all the facts and circumstances surrounding the master at and prior to the time of the accident. . . . It may be conceded that, when a subsequent invention is so simple in character that it might have occurred to a prudent man at any prior time, had he given the matter attention, then evidence of such subsequent invention may be sufficient for the purpose of guarding at a prior time.'' Nor can it be said that the evidence objected to would not have a tendency to show that it was a practical and efficient guard, because later on the defendant's assistant foreman, Phillips, was put on the stand and testified, without objection, that from October 1, there had been such leather guards on the machines, which guards prevent the pieces of broken drivers from striking the operator because they strike the guard or shield, and the guards did not prevent the operator from seeing the work as defendant's witnesses had claimed.

Complaint is made of a certain instruction given for plaintiff combined with the improper and prejudicial argument made to the jury in that behalf. The objection is not aimed at the instruction alone but rather at the prejudicial application of it in the argument. If the objection was based solely on the instruction we would consider it hypertechnical, but, in looking at the prejudicial argument made, we think defendant's complaint is well founded.

To understand this phase of the case the instruction and the argument must be considered together in the light of the evidence. The instruction in question

was plaintiff's instruction number four which told the jury that in assessing damages they could take into consideration the loss of plaintiff's *eyesight* and the physical pain and mental anguish they believe he will suffer in the future as the direct result thereof and that they could consider to what extent plaintiff's capacity for earning a livelihood will be impaired, etc. There was no error in the fact that the instruction was based on plaintiff's loss of *"eyesight"* rather than his "eye." Such an objection would be too hypercritical to deserve notice . But the complaint is aimed at the application made of the instruction in the argument, and that is the point to which we address ourselves.

The evidence was that plaintiff lost one eye; that it had not affected the other eye at all; that the affected eye had ceased to pain him. The eye specialist testified that the injury had not affected the other eye at all, so far as he could observe; but that possibly in the future he might have trouble in the other eye by reason of the sympathetic opthalmia, but declined to say that he probably would have it. Consequently there was no evidence, showing with reasonable certainty or with any reasonable probability, that the other eye would be affected or lost but merely a possibility that such might occur.

Upon this testimony, argument was made to the jury that the damages awarded should cover probable injury to the other eye. In the course of the argument one of counsel for plaintiff said: "Now, gentlemen of the jury, as to the measure of damages, I want you to award this boy a sum to compensate him for the loss of his eye and for the mental anguish and pain *and for the probability that in the future he will have trouble with the other eye."* This was objected to. The court, however, did not sustain the objection; but, on the speaker declaring that the doctor's testimony showed that injury to the other eye was probable, the

court remarked that he did not recall just what the testimony was on that feature but that the jury would remember it whatever it was, and for counsel to keep in the record. Defendant excepted to the action of the court in not properly and sufficiently acting upon the objection. Plaintiff's counsel, arguing the case, then said to the jury: "My recollection of the Doctor's testimony is that he said that there was a possibility of a sympathetic opthalmia, or some medical term, occurring in that other eye." Objection was made to this, but the court did not sustain the objection remarking that he thought that was a matter of argument. And defendant again excepted.

So that with the above instruction as to *eyesight* as a basis, plaintiff's counsel made an argument to the jury that in awarding damages they could consider the *mere possibility* of the loss of the other eye, and this argument was not corrected by the court. So that, in thus conjoining the instruction and the argument, it was the same, in effect, as if plaintiff in the instruction had asked for damages he had sustained or might possibly sustain to his remaining eye, or, to put it in the language of the argument, "for the probability that in the future he will have trouble with the other eye."

The rule is that there can be no recovery for future damages unless the evidence shows it is reasonably certain to happen. [Smith v. Railway, 169 Mo. App. 610 l. c. 617; Schwend v. Transit Co., 105 Mo. App. 534; Wilkerson v. Railway, 126 Mo. App. 613 l. c. 617; Reynolds v. Transit Co., 189 Mo. 408 l. c. 421.] But the evidence wholly failed to show it was reasonably certain there would be resulting injury to the other eye, and the unauthorized argument supported by an instruction capable of being understood in that sense, with no express positive ruling by the trial court declaring it improper, would naturally lead the jury to believe that under the law they could take into

consideration that the plaintiff might lose his other eye and be totally blind, although there was no evidence to show, with any reasonable certainty, that such would occur. This being the case, the error was perjudicial and substantial. The case is one likely to excite the sympathy of a jury and is peculiarly one in which a jury would be likely to consider such future results if there was never so slight a foundation therefor. But the law does not allow future damages to be given on mere conjecture or possibilities. The verdict of $10,000 shows that such a possibility must have entered into it. The remittitur of $4000 which the trial court indicated and which plaintiff accepted shows that it was larger than was deemed just, and that the jury must have considered elements which they should not have considered. Nor does the remittitur cure the error, since the defendant is entitled to a jury's judgment, correctly applied, as to the amount which should be paid. Who can say that the jury would have allowed even $6000 if they had understood they could not allow anything for a mere possible loss of the other eye?

For the above error the cause must be reversed and remanded. As a new trial is necessary it may be well to remark that when that is had, counsel for plaintiff should refrain from all inflamatory remarks likely to arouse passion or prejudice. The other remarks complained of were not helpful to a calm, dispassionate consideration of the case such as litigants are entitled to have. Nor should evidence be admitted that after the injury, the defendant refused plaintiff permission to enter the factory. Such evidence had no bearing on the issues in the case and would tend only to introduce improper elements therein.

The judgment is reversed and the cause is remanded for a new trial. All concur.